TANNER v. BACON, State Engineer, et al. (PROVO RIVER WATER USERS' ASS'N, Intervener).

No. 6205.   Decided April 29, 1943.   (136 P. 2d 957.)

*Christenson & Christenson,* of Provo, for appellant.

*Grover A. Giles,* Attorney General, *E. J. Skeen,* of Salt Lake City, and *A. V. Watkins, J. R. Morgan,* and *Brock-bank & Pope,* all of Provo, for respondent.

WADE, Justice.

This is an appeal by Caleb Tanner, plaintiff on the judgment roll from a judgment of the District Court, in an action to review the decision of the State Engineer rejecting the application of the plaintiff to appropriate waters in the Provo River for power purposes. The application was filed in the office of the State Engineer on February 28, 1925, for the appropriation of 100 c. f. s. of the waters of the Provo River, to be diverted into the Provo Bench Canal and conveyed therein about 10,300 feet to a power

plant. On December 31, 1925, the State Engineer rejected this application on the ground that the Governor had withdrawn those waters from appropriation. To review that decision plaintiff brought an action in the District Court. That court held the Governor's proclamation was void, and ordered the application reinstated with its original priority. The State Engineer received many protests against the approval of plaintiff's application. After the application was reinstated a hearing of these protests was held and the State Engineer again rejected plaintiff's application upon the grounds that its approval would be detrimental to the public welfare. To review this decision Tanner brought this action in the District Court. All of the protestants and the State Engineer were made defendants, and the Provo Water Users' Association, after its incorporation, intervened. The District Court again ordered the plaintiff's application reinstated, but decreed it to be subsequent to (a) all prior rights and all prior applications, (b) to the rights of the defendant Provo City under its applications, a part of which were filed subsequent to plaintiff's application, and (c) to the rights of the United States and the intervenor, Provo Water Users' Association in the development of the Deer Creek Project, both as to the reservoir now contemplated and future units which might be constructed. Tanner has prosecuted this appeal from that judgment. Since this appeal was taken Provo City has purchased Tanner's rights, thus eliminating any question as between those parties.

Plaintiff contends that the judgment of the District Court in the first action on his application is res adjudicata in his favor in this action. He argues that if the States Engineer can, after being reversed by the District Court, again reject the same application on other grounds, there will be no end of litigation. The plaintiff Tanner and the State Engineer were the only parties to the former action. The rights of the defendants who are here protesting plaintiff's application were not involved in that action. The State Engineer did not represent the interests of the defendants,

nor of the Provo River Water Users' Association, the intervenor in this action. In that action the application was rejected upon the grounds that the water had been withdrawn from appropriation. The State Engineer was alone interested in that ground, in this action he has disclaimed any interest in the result of this action. The defendants and the intervenor are the interested parties in this action.

It is well settled that the doctrine of res adjudicata does not operate to affect strangers to a judgment; that it only affects the parties and their successors in interest, and those who are in privity with a party thereto. 30 Am. Jur. 951, Sec. 220; 34 C. J. 756 to 758, Sec. 1165; *Glen Allen Mining Co.* v. *Park Galena Mining Co.,* 77 Utah 362, at 367, 296 P. 231; *State Bank of Sevier County* v. *American Cement & Plaster Co.,* 80 Utah 250, 10 P. 2d 1065; *Tintic Indian Chief Mining & Milling Co.* v. *Clyde,* 79 Utah 337, 10 P. 2d 932; *Taylor* v. *Barker,* 70 Utah 534, 262 P. 266, 55 A. L. R. 1032; *Mill* v. *Brown,* 31 Utah 473, 88 P. 609; 120 Am. St. Rep. 935. This court has defined the word "privity" as a "mutual or successive relationship to the same right or property. As applied to judgments or decrees of courts, the word means one whose interest has been legally represented at the time." *Glen Allen Mining Co.* v. *Park Galena Mining Company,* supra [77 Utah 362, 296 P. 233]. The State Engineer did not represent the interest of these defendants and the intervenor and therefore this action is not barred by the former action.

Plaintiff concedes that the rights which he may acquire under his application are subject to all the vested rights of prior appropriators, and all the rights which may be acquired under applications filed prior to his. He also concedes that he can acquire no rights under his application to the use of the waters which may be brought from the Weber and Duchesne river systems. Such waters having been appropriated and reduced to possession and ceased to be public waters and are not subject to appropriation.

The court found that the Utah Power and Light Company on December 10th, 1935, filed with the State Engineer's office an application to appropriate 200 c. f. s. of the waters of the Provo River to be used for boiler condensing purposes. The diversion point in that application and in plaintiff's application were approximately the same. That application was not protested, and was approved by the State Engineer on April 28, 1936. The State Engineer may not arbitrarily reject one application and approve another one for the same thing, even though the latter is not protested. The District Court, however, directed the State Engineer to approve plaintiff's application without making it subject to the application of the Utah Power and Light Company so plaintiff cannot complain.

We are not here called upon to determine what rights have been established under these applications, but only whether plaintiff's application should be approved, and the priority of the rights which he may acquire thereunder. *Eardley* v. *Terry*, 94 Utah 367, 77 P. 2d 362. Sec. 48, Chap. 67, Session Laws of Utah 1919, under which plaintiff's application was filed, which as amended is now Sec. 100-3-8, Utah Code Anno. 1943, merely provided for the State Engineer to approve or reject applications, It does not expressly provide for the approval subject to limitations as the court did in this case. Plaintiff has made no objection on this ground. Other states have held under statutes similar to ours that an application may be approved subject to limitations. *Kirk* v. *State Board of Irrigation*, 1912, 90 Neb. 627, 134 N. W. 167; *East Bay Municipal District* v. *Department of Public Works*, 1934, 1 Cal. 2d 476, 35 P. 2d 1027; *Young & Norton* v. *Hinderlider*, 15 N. M. 666, 110 P. 1045.

Plaintiff filed his application with the State Engineer on February 28, 1925. Prior thereto, in 1921, the legislature created the Water Storage Commission. In 1922, that commission contracted with the United States Bureau of Reclamation for the planning and the investigation of the possi-

bilities of storing the waters of the Weber, Duchesne and Provo River systems. Such investigations and plans were commenced immediately and have continued up to the time of the commencement of this action, and at the time that plaintiff's application was filed the State of Utah had spent more than $25,000 thereon. As a result thereof a reclamation project was formed for the purpose of bringing the unappropriated waters of the Weber and Duchesne rivers river systems into the Provo river system, and the construction thereon of a large storage reservoir to be known as the Deer Creek Project. It was planned that the waters so stored would be used to supplement the supply for domestic and culinary purposes for many cities and towns in Summit, Utah and Salt Lake Counties, and also supplement the supply for irrigation and industrial purposes in those counties. Pursuant to these plans, in 1924, the State of Utah filed numerous applications to appropriate the above mentioned waters. Later these applications were assigned to the United States.

On May 2, 1935, the Provo River Water Users' Association was incorporated under the laws of this state, to act as intermediary between the United States and the prospective consumers of the waters to be stored in the Deer Creek Project. On June 27, 1936, this association entered into a contract with the United States, whereby it agreed to pay the costs of the construction of this project and in consideration therefor was to receive the permanent right to the use of the waters made available by the project. The United States, however, was under no obligation to construct the project until arrangements had been made for the annual storage of a satisfactory amount of water, and for an exchange of water with the prior appropriators of the waters of both the Weber and Provo rivers for power purposes, so that the flood waters of both these river systems might be stored in this project and used for power purposes only when it could be used also for consumptive purposes.

The trial court in addition to finding the foregoing facts also found: that the plaintiff's proposed use of the waters may interfere with the more beneficial use of such waters for domestic, culinary and irrigation purposes, and for the generation of electric power, and with its fluctuation of the flow of these waters, as required by the arrangements with the owners of the power rights, and decreed as follows:

"(b) That plaintiff's rights under the Application shall also be subject, and subordinate and inferior to the rights of the United States and the Provo Water River Users' Association, their successors and assigns, to divert, change the place of diversion of, impound, store, exchange, fluctuate, and use for domestic, culinary, stockwatering, irrigation, power and other purposes, the waters of the Provo River and its tributaries, and the waters of the Weber and Duchesne rivers and their tributaries in connection with the Deer Creek reclamation project including the reservoir now contemplated and future units or reservoirs which may hereafter be constructed for storage, diversion or use of waters of the Provo river and/or its tributaries in connection with or as a part of said project."

In its Findings of Fact the trial court found that the rights of the United States and the Provo River Water Users' Association, which it decreed to be prior to plaintiff's rights, are based upon and may be acquired under applications which it expressly found had been filed with the office of the State Engineer. It expressly found the number of each of such applications, together with the date of filing, and a description of the waters proposed to be appropriated thereunder. Thus it is apparent that the trial court intended to limit the rights which it held to be prior and superior to the rights of the plaintiff, to such rights as may be acquired under the applications which it expressly found had been filed. The court made no findings of fact which would justify a decision that plaintiff's rights are subject to any other rights, and so any decision to that effect would not be justified by the facts found and would be void. We therefore hold that as to the rights determined under this decree, plaintiff's rights are subject only to such rights as may be acquired

under the applications which the court expressly found had been filed prior to the time of the trial. As to all other rights plaintiff's priority shall date from the filing of his application.

Other than applications to appropriate the waters from the Weber and Duchesne river systems, there is only one application found by the court to have been filed, and upon which the United States and the Provo River Water Users' Association base their claims, which was filed subsequent to plaintiff's application. Our problem in this case deals with that application alone. As found by the trial court the description of that application is in part as follows:

"Application No. 12,144—dated April 3, 1936, covering an exchange of water between the Deer Creek division of the Provo River Project and the interest of Utah Lake, whereby Provo river water, up to 30,000 acre feet annually, may be stored in the Deer Creek Reservoir in lieu of certain seepage return flow and/or other waters belonging to the United States which will flow into and augment the water supply of Utah Lake as a result of the construction and operation of the Deer Creek Reservoir * * *."

By this application it is proposed to store annually in the Deer Creek Reservoir 30,000 acre feet of the flood waters of Provo river, which has been appropriated to a beneficial use after it reaches Utah Lake. It being anticipated that the construction and operation of the Deer Creek reservoir will cause sufficient water to reach Utah Lake by seepage and return flow, to satisfy the demands of the prior appropriators of such waters. The storing of these flood waters might interfere with the use which plaintiff proposes to make of the unappropriated waters of Provo river. This presents the proposition of whether the court erred in holding that the rights which plaintiff may acquire under his application are subject to the rights which the United States and the Provo Water Users' Association may acquire under application 12,144 above described, which was filed subsequent to the plaintiff's application.

The District Court's decision is not contrary to the doctrine of priorities. Counsel argues that under that doctrine,

every person who applies to appropriate unappropriated waters of this state has an unqualified right to have such application approved. This is not the law. Sec. 10, Chap. 7, Laws of Utah 1919, which contains the law on that subject which was in effect at the time plaintiff's application was filed (now 100-3-21, Utah Code Anno. 1943), applies only to vested rights, and not to the right to appropriate water in the future. The law which governed the right to make future appropriations when plaintiff filed his application is Sec. 48, Chap. 67, Laws of Utah for 1919, (as amended is now 100-3-8, U. C. A. 1943), which provides:

"Where there is no unappropriated water in the proposed source of supply, or where the proposed use will conflict with prior applications or existing rights, or where the approval of such application would in the opinion of the State Engineer *interfere with the more beneficial use for irrigation, domestic or culinary purposes, stock watering, power or mining development, manufacturing, or would prove detrimental to the public welfare,* it shall be the duty of the State Engineer to reject such application." (Italics added.)

Where the approval of the application would, in his opinion, interfere with the more beneficial use for any of the purposes mentioned, or would prove detrimental to the public welfare, the State Engineer is directed to reject the same. In 1903, when the legislature created the office of the State Engineer, and provided for the filing of applications to appropriate water, he was directed to reject any application which "threatens to prove detrimental to the public interest," Sec. 40, Chap. 100, Laws of Utah 1903. This provision was omitted in the amendment of 1905, Sec. 39, Chap. 108, Laws of Utah 1905. In 1911 this section was again amended and it contains a provision similar to the 1919 law, Sec. 1288x10, Chap. 103, Laws of Utah 1911. Since then our law has contained a similar provision. Thus our statute expressly provides that the State Engineer shall reject applications under specified conditions, in the interest of the public welfare, even though all of the waters of

the stream covered by the application have not been appropriated.

Sec. 1, Chap. 67, Laws of Utah 1919 (which as amended is now 100-1-1, U. C. A. 1943), provides:

"The water of all streams and other sources in this State, whether flowing above or under the ground, in known or defined channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof."

These statutes may not vest the state with the proprietary ownership of the water but they clearly do enjoin upon the state the duty to control the appropriation of the public waters in a manner that will be for the best interests of the public. The precise question involved in this case has never been passed on by this court but similar questions have been before the courts of other states, under statutes much like ours, where it has been invariably held that the state may reject or limit applications to appropriate its unappropriated waters. *Young & Norton* v. *Hinderlinder*, supra; In re *Commonwealth Power Co.*, 94 Neb. 613, 143 N. W. 937; *Kirk* v. *State Board of Irrigation*, 90 Neb. 627, 134 N. W. 167; *Cookingham* v. *Lewis*, 58 Or. 484, 114 P. 88, 115 P. 342; In re *Willow Creek*, 74 Or. 592, 144 P. 505, 146 P. 475; *East Bay Utility District* v. *Department of Public Works*, 1 Cal. 2d 476, 35 P. 2d 1027, 1029.

Plaintiff's counsel contend that, "the purported power of rejection on the grounds acted upon in this case, in the absence of a legislative standard or something more to guide the engineer in his determination is a flagrant and unlawful delegation of legislative authority." In *East Bay Utility District* v. *Department of Public Works*, supra, this question was discussed. There the petitioner applied for a permit to appropriate for power purposes, the unappropriated waters of Mokelumne river. The department inserted in the permit the following provision :

"The right to store and use water for power purposes under this permit shall not interfere with future appropriations of said water for agricultural or municipal purposes."

The California statute under which the department acted contained the following provisions:

"It is hereby declared to be the established policy of this state that the use of water for domestic purposes is the highest use of water and the next highest use is for irrigation. In acting upon applications to appropriate water the commission shall be guided by the above declaration of policy. The commission shall reject an application when in its judgment the proposed appropriation would not best conserve the public interest." St. 1921, p. 443, § 15.

The court said:

"Of course, it must always be kept in mind that the state authority cannot arbitrarily, and upon caprice only, reject an application. Clearly, the manner in which the unappropriated waters of the streams of the state shall be distributed among the applicants therefor involves questions of policy, and the Legislature, in the interest of public welfare, may prescribe reasonable conditions.  *  *  *  Where the facts justify the action, the water authority should be allowed to impose, in the public interest, the restrictions and conditions provided for in the act."

The California statute authorized the commission to "reject an application when in its judgment the proposed appropriation would not best conserve the public interest." Our statute directs the engineer to reject an application when its approval would, in his opinion, "interfere with the more beneficial use" of the water, or "would prove detrimental to the public welfare." The California statute expressly declares "that the use of water for domestic purposes is the highest use  *  *  *  and that the next highest use is for irrigation." Our statute, Sec. 10, Chap. 67, Laws of Utah 1919 (now 100-3-21, U. C. A. 1943), provides that, "in times of scarcity,  *  *  *  the use for domestic purposes shall have preference over use for all other purposes  *  *  *  and use for agricultural

purposes shall have preference over use for any other purpose except domestic use." While this statute did not lay this rule down expressly to guide the engineer in rejecting or approving applications as did the California statute, it did indicate clearly that the legislature considered those two uses as the two most beneficial uses which water may be applied to. That domestic use is the most beneficial use for water and that irrigation is the next most beneficial use in the arid western states is a self-evident and well recognized fact regardless of any statute. So under the authority of this California case if the State Engineer or the District Court in his stead applied those standards and did not act arbitrarily or capriciously his action must be upheld.

Here the state had spent in excess of $25,000 merely in investigation and planning for this project, prior to the filing of plaintiff's application. The United States was interested and had indicated its willingness to construct the project if sufficient water could be obtained for storage purposes, and proper arrangements could be made with the holders of the power rights on the streams in question. The plans which were then in the formative stages contemplated the expenditure of large sums of money to bring the water from the Weber river and to tunnel through a mountain to the Duchesne river to obtain the necessary water for this project. By this project it is planned to supplement the supply of water for domestic and irrigation purposes to a larger portion of the population of this state. In the face of this, if plaintiff's application were approved without limitations, he would be entitled to have the flood waters of the Provo river run through his plant, and thereby prevent the storage thereof in the Deer Creek reservoir, regardless of how great the demand for water might be, and regardless of the fact that if it were stored it might be used for power purposes during the dry seasons and at the same time be used for domestic and irrigation purposes. Thus the facts found are suffi-

cient to support the decree and the District Court did not act arbitrarily.

The District Court, in limiting the priority of plaintiff's rights, relied on two separate and distinct provisions of the statute: First, the provision which requires the engineer to reject an application where in his opinion its approval would "interfere with the more beneficial use for irrigation, domestic or culinary purposes, stock watering, power or mining development, [or] manufacturing, * * * ." This provision does not provide that one of the uses mentioned is a "more beneficial use" than any other use mentioned. It does not indicate that the uses mentioned first are more beneficial than those mentioned later. It refers to each use mentioned as "the more beneficial use," thus indicating that such use under certain circumstances may be a more beneficial use, and limiting the possible more beneficial uses to those mentioned. It mentions almost all possible beneficial uses, thus indicating that under certain circumstances one of the mentioned uses might be more beneficial than another, and not limiting the uses which are not more beneficial to uses other than those mentioned. Evidently the legislature intended that upon the filing of an application to appropriate water the State Engineer should determine from the facts and circumstances of each case whether the approval thereof would interfere with the more beneficial use of the water, for one of the purposes mentioned, whether the purpose proposed in the application was for one of the purposes mentioned or for some other purpose. This is the construction placed upon this provision by the District Court. It found that to store the flood waters of the Provo river to be later used for domestic, irrigation and other purposes was the more beneficial use which the approval of plaintiff's application, without making it subject to those rights, would interfere with. This decision not being arbitrary or capricious but based upon experience and well recognized principles must be sustained.

The State Engineer is also required by the statute to reject an application where in his opinion its approval "would prove detrimental to the public welfare." Under a statute using the exact words above quoted, the Supreme Court of Nebraska has approved the rejection of an application where there was a prior application to appropriate the same water. In re *Commonwealth Power Co.*, supra, and in *Kirk* v. *State Board of Irrigation*, supra, under the same statute, that court held that the Board acted within the statute where it approved an application to appropriate water for power purposes, with the limitation that the electricity generated shall not be transmitted beyond the boundary of that state. These decisions hold that anything which is not for the best interest of the public would be "detrimental to the public welfare." The Supreme Court of Oregon has given the terms "menace to the safety and welfare of the public" a similar construction. *Cookingham* v. *Lewis*, 58 Or. 484, 114 P. 88, 91, 115 P. 342; In re *Willow Creek*, 74 Or. 592, 144 P. 505, 146 P. 475. Under this construction the State Engineer was authorized to reject or limit the priority of plaintiff's application in the interest of the public welfare.

Nor does the fact that the Governor is authorized by law to withdraw waters from appropriation, Sec. 100-8-1, U. C. A. 1943, indicate that the engineer may not reject an application under the facts of this case. The statutes clearly contemplated the withdrawal by the Governor and the rejection by the engineer, and the one does not indicate that the other should not be exercised.

The decision of the District Court is affirmed with costs to the respondents.

McDONOUGH, J., concurs.

WOLFE, Chief Justice (concurring).

I concur. I assume that the State Engineer could not reject an application on the ground that if approved it

would "prove detrimental to the public welfare" because in his mind he conceived some ultimate or remote public project which would need the water. A farsighted person with imagination and bold conceptions may visualize projects which in the future may be most beneficial to the state. Perhaps we should plan a campaign for the most effective use of all unappropriated waters of the state and work to that end, but until such plans are formulated, or at least the water is withdrawn from appropriation for such purposes, I do not conceive that ideal conceptions for future and better public use of water in the State Engineer's head can be the basis for refusing to approve an application. It is not now necessary to draw the line on the degree of concreteness to which plans or projects must have attained to form bases for legal rejections by the Engineer. Suffice it to say in this case that the Deer Creek project reached a point in conception and realization where it could definitely be said to be against public interest to affirm any application which would interfere with its fruition.

LARSON, Justice (concurring).

I concur. But in view of the nature of this action, and the arguments made therein, I deem it proper to add some further reasons for my concurrence than are stated in the opinion of Mr. Justice WADE.

While there are many assignments of error, they may be summarized in three questions: (1) Was the judgment of the District Court in reversing the action of the engineer on his first rejection of Tanner's application and reinstating it, merely an adjudication of Tanner's right to have his application approved so he could proceed with developmen work, or was it an adjudication of the rights to appropriate and all objections that might be urged thereto?

(2) Has the engineer the right and power to determine whether public welfare will be better subserved by the appropriation of water for one beneficial use than by its appropriation for different beneficial uses?

(3) Can an application to appropriate water be rejected because a different use in futuro may seem more beneficial?

By his complaint Tanner seeks to set forth a plea of res adjudicata, alleging the first rejection of the application and the action thereon in the District Court. The pleadings in that action are not set forth, neither are the findings of fact, the conclusions of law, nor the judgment and decree, but it is alleged that "said rejection was made upon the specific ground that the waters involved had been withdrawn from appropriation." This appeal being on the judgment roll, we cannot examine the record, nor the judgment roll of the former case. The court in the instant case made two findings of fact with respect to the former trial. Those findings are not assailed, and we must conclude therefore that they are sustained by the evidence. Finding No. 5, after finding that the action was commenced, reads:

"* * * that at the time of the trial of said action the plaintiff and the defendant made a stipulation by the terms of which it was agreed that, for the purpose of that suit and in order to raise an issue as to whether the water involved had in fact been withdrawn from appropriation, there was unappropriated water in Provo river at the proposed point of diversion, that the proposed use would not interfere with existing rights and would not interfere with any more beneficial use of the water sought to be appropriated, and that the same would not be detrimental to the public welfare; that thereafter the court in said cause made and entered its decree providing for the reinstatement of said application in the office of the State Engineer with its original priority; that the said judgment was not intended as an adjudication of the issues raised by the answers of the defendants herein, but was intended only as an adjudication of the validity and effect of certain proclamations withdrawing water from appropriation;"

And Finding No. 26 contains this:

"* * * a judgment was rendered and entered June 4, 1928, in which it was adjudged and declared that said proclamation was null and void in so far as plaintiff's application herein was concerned;"

This is all we have before us with reference to the claim of res adjudicata. Let us assume, without deciding the

point, that the pleadings were sufficient to raise the issue of res adjudicata. The burden is then on the party who seeks to avail himself of the former judgment as an.adjudication of the subject matter to prove the judgment, and the fact that the point or question as to which he claims estoppel by the judgment was actually or necessarily in issue and decided in the prior action; or was necessarily involved and decided in determining the real issue in such action. 30 Am. Jur. 996, 997. If the judgment relied upon was rendered in an action involving several issues of fact, but is ambiguous and uncertain as to which of the several issues was the one determined in arriving at the decision, it must be shown upon which issue the judgment was based, or the judgment does not constitute a conclusive adjudication as to any of them. *Fayerweather* v. *Ritch,* 195 U. S. 276, 25 S. Ct. 58, 49 L. Ed. 193. And where a judgment recites a finding on one issue which compels a judgment for one party, and is silent as to the rest, the latter in the absence of further showing will be held open to inquiry in future litigation. 30 Am. Jur. 998; *Hudson* v. *Remington Paper Co.,* 71 Kan. 300, 80 P. 568, 6 Ann. Cas. 103. The question is as to whether the same issue was involved in each case. That is generally a matter of law for the court, based upon an examination of the judgment roll of the former action, although resort may be had to the entire record of that action. *State of Oklahoma* v. *Texas,* 272 U. S. 21, 47 S. Ct. 9, 71 L. Ed. 145; *United Shoe Mach. Corp.* v. *United States,* 258 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708; *Young* v. *Byrd,* 124 Mo. 590, 28 S. W. 83, 46 Am. St. Rep. 461; *Sprague* v. *Adams,* 139 Wash. 510, 247 P. 960, 47 A. L. R. 529. But where a dispute exists, because the record is not clear as to whether the question involved in the second suit was involved in the first, and extrinsic evidence may be needed, there may be factual situations to be determined. 30 Am. Jur. 994. In the instant case the court was judge of both law and fact, and it determined that the former action was not a determination of any matters involved in

this action. Since neither the judgment, the judgment roll, nor the stipulation or evidence is before us, we must conclude that the finding of the trial court in that regard was correct.

The waters of all streams in this state are the property of the public, subject to all existing rights to the use thereof. Section 100-1-1, R. S. U. 1933. Beneficial use is the measure and limit of all rights to the use of water. 100-1-3, R. S. U. 1933. Rights to the use of unappropriated public waters may only be acquired by appropriation as provided by statute, 103-3-1, R. S. U. 1933. No private rights to the use of water, initiated since the adoption of the state constitution, can be acquired except in the ways recognized by the law, and subject to the limitations thereby imposed. Due to the limited supply of water and its importance to the people of the State, it has wisely been provided that this resource shall be so used as to best subserve the needs of the people and the development of the state, to the end that no one shall acquire a dominating right to such use of water as will retard the maximum development of the state's resources, or curtail the satisfaction of the people's needs in the things most important to their sustenance, development and happiness. The section directly involved, Sec. 48, Chap. 67, Laws of Utah 1919, provides (Sec. 100-3-8, R. S. U. 1933, U. C. A.) :

"All applications * * * shall be filed * * * and it shall be the duty of said engineer * * * to approve all applications where the proposed use will not impair the value of existing rights, or will not interfere with the more beneficial use of said water; * * * where the State Engineer, * * * has reason to believe that said application to appropriate water will interfere with the more beneficial use for irrigation, * * * or will prove detrimental to the public welfare, it shall be the duty of the State Engineer to withhold his approval or rejection of such application until he shall have investigated the matter. * * * Where there is no unappropriated water in the proposed source of supply, or where the proposed use will conflict with prior applications or existing rights, or where the approval of such application would in the opinion of the State Engineer interfere with the more beneficial use for irrigation, domestic or

culinary purposes, stock watering, power or mining development, manufacturing, or would prove detrimental to the public welfare, it shall be the duty of the State Engineer to reject such application."

It is the duty of the engineer to (a) approve certain applications, and (b) to disapprove certain applications. The engineer must determine therefore whether a given application falls in class (a) or class (b). The distinctions between the two classes are set out in the part of the statute quoted. The first two tests are determined upon the consideration of existing facts—the existence of unappropriated waters, and the extent of conflict with existing rights. The other two tests cannot be resolved by the determination of an existing fact. They have to do with future events, developments and policies, and must therefore be resolved by the judgment of some body as to what the probable effects will be.

The matter of interference "with the more beneficial use" or being "detrimental to the public welfare" must of necessity refer to uses or appropriations proposed or likely to be proposed in the future, that is, to probable uses or application to appropriate or use, of a date subsequent to the application under consideration by the engineer. If such were not the case, the clauses would be meaningless, for all prior applications come under the protection of the second test: "Conflict with prior applications or existing rights." Where a matter is of such moment and serious public concern as water is in this state, and is property of the public, it properly is declared not subject to private rights or claims except to the limited extent provided by law, in the uses which shall be deemed most beneficial to the public welfare, as contradistinguished from the benefit of the individual. Since all waters flowing in natural streams in the state are the property of the public, no one has an inherent or vesed right to appropriate it to a private use. Under the limitations provided by law, one may acquire certain rights to the use thereof, including diversion from the natural channels, but only as such uses may

be deemed in the public benefit. Only in the way recognized by law can private rights to water vest in any one. The state, as trustee for the people, must so administer its trust as not to permit its misuse, or its use in any way adverse to the interests of the public. So the state engineer and the court are made the guardians of the public welfare in the appropriation of the public waters of the state, and this necessarily involves a large discretion in such matters. If the public welfare demands, they may grant a qualified and limited right of appropriation and in the beneficial use of the water so appropriated. *Kirk* v. *State Bd. of Irrig.*, 90 Neb. 627, 134 N. W. 167; *East Bay Municipal Util. Dist.* v. *Dept. of Pub. Works*, 1 Cal. 2d 476, 35 P. 2d 1027; *Young & Norton* v. *Hinderlider*, 15 N. M. 666, 110 P. 1045; *Farm Investment* v. *Carpenter*, 9 Wyo. 110, 61 P. 258, 50 L. R. A. 747, 80 Am. St. Rep. 918; In re *Commonwealth Power*, 94 Neb. 613, 143 N. W. 937. "More beneficial use" means more beneficial to the public; means better subserving the public welfare. Such question must be determined by consideration of existing conditions; of the need for the various or contemplated possible uses; of the probable effects of such uses in satisfying or ministering to the public needs; of the relative urgency and importance of public needs which would be satisfied by the different uses; and the probable effect on the public order, morale, and welfare by one use in preference to another. The weighing of such matters in the balance and the determination thereof must of necessity be vested in some official body. The state has seen fit to vest it in the engineer for the purpose of determining whether the application should be filed to initiate a right. But at the behest of any interested party vests the final determination of both facts and law in the District Court. The statute not only vests in the engineer the power to determine whether the public welfare will be better subserved by one use of water than another, when an application to appropriate is before him, but makes it his duty to determine such matter, for the purpose of determining if the application should be filed and the appli-

cant permitted to proceed and make an appropriation if he can do so. His determination is in every case subject to a re-examination upon the merits on a trial in a plenary action, in the District Court, in the exercise of its original jurisdiction. Issues may there be framed, covering all issues which were or which could have been before the engineer, or any other which the plaintiff thinks would help or strengthen his cause. The court does not review the judgment of the engineer but in the exercise of its original jurisdiction hears and determines the matter on the merits, on pleadings and issues raised in the court, independent of any issues, or action thereon, before the engineer.

It is contended that if the engineer has such power it is void as a delegation of legislative power, since there are no standards or guide posts set up by the legislature to guide the engineer in determining which use is more beneficial, or what is detrimental to the public welfare. Be it noted that the engineer, in passing upon applications to appropriate water, is not in the same position as most administrative boards. No conclusion, finding, or action of the engineer in approving or rejecting an application to appropriate water is final or binding upon any party who may feel aggrieved thereby, except as to the right of the applicant to have his application filed, and thereby fix the time of his priority, if he proceeds and completes or perfects an appropriation. Resort may be had to the District Court by the applicant, or by any protestant, and the whole matter is then tried on the merits, on pleadings and issues framed in the court. The District Court does not review the action of the engineer, and affirm or reverse that action. It hears the evidence of the parties on all issues properly made by the pleadings, and makes its own original determination of facts and law without reference to any action the engineer may have taken. And the court's judgment is conclusive and mandatory in form. It does not affirm or reverse, but directs the engineer to take certain specific action. The judgment of the court then fixes the

rights of the parties with respect to the application. Such was done here, and it is the judgment of the court which Tanner seeks to have reviewed and reversed as to the judgment here attacked, which is an original judgment of the court. It matters not whether standards are fixed to guide the judgment of the engineer. It is not the action or judgment of the engineer, nor any proceeding before him that we are asked to review. It is an original judgment of the District Court that is before us on this appeal. The matters of standards for the guidance of the engineer cannot affect the judgment of the District Court rendered on the merits. The necessity of legislatively fixed standards to measure and guide the action and judgment of administrative officials does not apply to the courts, the judiciary. That applies only to administrative bodies to which it is claimed legislative power has been delegated.

This appeal being on the judgment roll from the District Court, we must assume the findings of fact are supported by the evidence. They are within the issues formed by the pleadings. The conclusions of law are sustained by the findings of fact, and the judgment accords with the conclusions of law. I therefore concur in affirming the judgment.

MOFFAT, Justice (dissenting).

The propositions decided by the principal opinion are based upon the findings and decree of the trial court. The opinion states that it recognizes the doctrine and law of priority in the appropriation of water. Notwithstanding the statement, it proceeds to give priority to an application filed subsequent to the Tanner application.

The Tanner application was filed in the office of the State Engineer on the 28th day of February, 1925, and given filing number 9697, which date and filing number fix the priority right when the appropriation and application to a beneficial use has been made pursuant to the requirements incident to the perfection of the right. The Tanner application has been in litigation since shortly after its filing until the present time.

Then application numbered 12,144, dated April 3, 1936, was filed in the office of the State Engineer. This application proposes an exchange of water, says the principal opinion,

"between the Deer Creek division of the Provo River Project and the interest of Utah Lake, whereby Provo river water, up to 30,000 acre feet annually, may be stored in the Deer Creek Reservoir in lieu of certain seepage return flow and/or other waters belonging to the United States which will flow into and augment the supply of Utah Lake as a result of the construction and operation of the Deer Creek Reservoir."

The hybrid "and/or" may mean a multitude of things in the instant case. The opinion then continues:

"By this application it is proposed to store annually in the Deer Creek Reservoir 30,000 acre feet of the flood waters of Provo river which has been appropriated to a beneficial use after it reaches Utah Lake. It being anticipated that the construction and operation of the Deer Creek Reservoir will cause sufficient water to reach Utah Lake by seepage and return flow to satisfy the demands of prior appropriators of such waters."

Sec. 100-3-21, U. C. A. 1943, which has been in force for many years, provides:

"Appropriators shall have priority among themselves according to the dates of their respective appropriations, so that each appropriator shall be entitled to receive his whole supply before any subsequent appropriator shall have any right."

There is then in the section a proviso for preference of use during times of scarcity, not involved in this case.

The plaintiff Tanner has since the filing of the application conveyed or assigned the application and rights to be matured thereunder to Provo City. It is said some of the applications made by Provo City were subsequent to the Tanner application. Under Sec. 100-3-18, U. C. A. 1943, such transfers may be made prior to issuance of certificate of appropriation.

"Rights claimed under applications for the appropriation of water may be transferred or assigned by instruments in writing. * * *"

This creates an anomolous situation. Provo City has applications prior and subsequent to the Tanner application which it now owns. On account of this merger by assignment, the respective priorities of these applications are not considered in the principal opinion. Provo City now ceases to be an adverse party against the Tanner applications and now maintains the validity and rights of priority under them. This question is not being contested and is recognized as between Provo City and Tanner.

The principal opinion defers the date and right of priority to those of the

"United States and the * * * Provo Water Users' Association in the development of the Deer Creek Project, both as to the reservoir now contemplated and future units which might be constructed."

With this doctrine I cannot agree. The Utah Water Storage Commission or the United States Bureau of Reclamation could have made an application to the State Engineer's Office to make such appropriations as might appear to be reasonable and necessary in furtherance of an anticipated project. Failing to do this, an application made subsequent to the Tanner application must under the statutes of Utah take a subsequent date as to priority.

"The priority of an appropriation shall be determined by the date of receiving the written application in the State Engineer's office." Sec. 100-3-18, U. C. A. 1943.

When this date is fixed it may be deferred for "failure to make proof of appropriation or proof of change of the water on or before the date set therefor." Such failure will work a lapse of the application. Nor may the certificate of appropriation issued by the State Engineer upon completion of works and proof of application to a beneficial use enlarge or extend the rights described in the application. Sec. 100-3-17, U. C. A. 1943.

Nor can I agree that the proposed

"exchange of water between the Deer Creek division of the Provo River Project and the interest of Utah Lake, whereby Provo river water, up to 30,000 acre feet annually, may be stored in the Deer Creek Reservoir in lieu of certain seepage return flow."

Seepage water is ordinarily not subject to appropriation. *Petersen* v. *Cache Co. Drain Dist. No. 5*, 77 Utah 256, 294 P. 289, and cases there cited. In this instance it is problematical and specluative, uncertain and may interfere with older and vested rights, assuming that such seepage is or may become a feeder to Utah Lake. Certainly, the Deer Creek Reservoir cannot become a feeder to Utah Lake in such way as to supply the Tanner application rights, Tanner being between the reservoir and the lake.

Whether the principal opinion intended to endorse as the law the statement that "the district court's decision [here affirmed] is not contrary to the doctrine of priorities," the doctrine of the opinion is utterly destructive of the doctrine of priority in the appropriation and use of water in this State. I therefore dissent.