707 P.2d 441

Edward C. SHOKAL, Cole M. Reed and Billie Reed, Petitioners/Appellants/Cross-Respondents,

v.

A. Kenneth DUNN, Director, Department of Water Resources, and Trout Co., Holder of Permit No. 36–7834, an Idaho corporation, Defendants/Respondents/Cross-Appellants,

STATE of Idaho, DEPARTMENT OF FISH AND GAME, Petitioner/Intervenor/Cross-Respondent,

v.

A. Kenneth DUNN, Director, Idaho Department of Water Resources, In the matter of protest against approval of application for permit holder 36–7834, in the name of Trout Co., and Trout Co., an Idaho corporation, Defendants/Respondents/Cross-Appellants.

No. 15227.

Supreme Court of Idaho.

Sept. 24, 1985.

332

William L. Mauk, Boise, for appellant Shokal.

Paul M. Beeks (argued), and Leon E. Smith, Jr., Twin Falls, for respondent Trout Co.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and Phillip J. Rassier (argued), Deputy Atty. Gen., Boise, for respondent Water Resources.

William B. Dillon, Deputy Atty. Gen., Boise, for intervenor Fish & Game.

BISTLINE, Justice.

On December 21, 1978, respondent Trout Co. applied for a permit to appropriate 100 c.f.s. of waters from Billingsley Creek near Hagerman, Idaho. Numerous protests were filed by local residents, property owners, and Billingsley Creek water users. The Department of Water Resources (Water Resources) held a hearing on the application on April 24, 1979, and issued Permit No. 36–7834 on November 14, 1979, pursuant to an order of that same date. This order was subsequently amended on December 21, 1979.

Some of the protestants, including the petitioners and appellants here, sought judicial review in the Fourth Judicial District Court, where the matter came before District Judge Gerald F. Schroeder. On December 22, 1980, Judge Schroeder issued an opinion and order reversing the decision of the Director of Water Resources and remanding the application for further proceedings. Judge Schroeder found Water Resources' consideration of at least two issues inadequate: (1) The financial ability of the applicant, and (2) the local public interest with respect to the proposed water project. Judge Schroeder also found errors of law in assigning the burden of proof. He held that the applicant for a permit had the burden of showing the impact of the project on the public resource, whereas a party who claimed a harm peculiar to himself had the burden of going forward to establish that harm. Judge Schroeder also determined that Water Resources had failed to properly evaluate the question of "local public interest," holding that the applicant had the ultimate burden of proving that a proposed water use was in the local public interest under I.C. § 42–203A.[1]

In response to Judge Schroeder's decision, Water Resources held four days of hearing on May 5 and 6 and June 22 and 23, 1981. The Director, acting as hearing officer, excluded any testimony or exhibits which were prepared or enhanced between May 6 and June 23, overruling the objection of protestants. As a result of this new hearing, Water Resources issued a 32-page memorandum decision and order on October 28, 1981. In the memorandum decision, the Director attempted to address all of the criteria and conditions established by Judge Schroeder's decision. The Director conditionally granted the application upon a subsequent showing by the applicant,

---

1. Our citations reflect the current designations of these statutory provisions.

Trout Co., that the project would meet certain requirements and restrictions set forth in the order. Accordingly, the Director again approved Permit No. 36–7834 for fish propagation and hydropower generation, subject to specific conditions. Among those conditions was the requirement that the effluent from the facility meet certain criteria, as set forth in the order. Monitoring devices were imposed to measure compliance with the criteria. Water Resources was directed to retain jurisdiction over the application to insure compliance. Finally, the order directed that the applicant submit new design and construction plans for the proposed fish propagation facility, to be considered, reviewed, and approved by Water Resources to insure compliance with Condition No. 16 of Water Resources' order pertaining to water quality and effluent control requirements.

The protestants objected to this procedure, and submitted requests for rehearing. These objections and requests were overruled in Water Resources' order of November 18, 1981. This order made some revisions in the original decision and order in response to objections made by protestants, but denied any rehearing on the application. Water Resources required the applicant to "submit acceptable plans" demonstrating that the proposed facility would meet the standards of the original order as amended. Protestants were given 60 days from the submission of these plans to submit objections in writing, but allowed no opportunity for cross-examination or to present testimony on the new plans.

In response to request for determination of finality, the Director issued his final order on January 26, 1982. That final order contained further discussion of the provisions of the original decision and order and stated that none of the orders issued at that time were final or appealable orders.

Subsequently, Trout Co. submitted a new set of drawings of the facility, and a document entitled "Contemplated Operational Criteria for the Trout Co. Fishraising Facility" (hereinafter "Operational Criteria"). The petitioners, appellants here, again pro-tested as to the sufficiency of the applicant's "Operational Criteria." Protestants argued that these documents, taken together, constituted a radical departure from the original application, altering the size, rearing capacity, area, volume and water velocity in the facility, but without any additional information concerning the actual or even projected ability of the facility to meet the effluent standards in Condition No. 16 of the prior decision and order, as amended. Protestants argued that the "Operational Criteria" so drastically departed from the original application that it constituted a new proposal.

The protestants filed new protests raising many factual issues regarding the "Operational Criteria." After reviewing the "Operational Criteria" and considering the objections raised by the protestants and other parties, Water Resources, without further hearing, issued its final order on July 21, 1982, granting the application for Permit No. 36–7834. Appeal was again taken to the district court, this time before the Honorable W.E. Smith. After briefs were submitted and oral argument was held, Judge Smith issued his memorandum decision and order, reversing the decision of Water Resources and remanding the case to Water Resources for further proceedings, including a new hearing consistent with the court's order.

While we affirm the decision of the district court to remand for a new hearing, we differ on the matters necessary for consideration at the new hearing. We hold that Water Resources used the proper standard for and has adequately dealt with the financing question. In addition, although we in general affirm the district court's order as it related to public interest matters, we modify in part the district court's guidelines.

## I. THE DISTRICT COURT PROPERLY REMANDED THE APPLICATION FOR A NEW HEARING

After the second hearing, Water Resources issued findings of fact and conclusions of law including stringent require-

ments regarding effluent discharge. Trout Co. determined its first plan was unable to comply with the new water quality standards imposed by Water Resources. Trout Co. reworked the plans for the project and submitted a Contemplated Operational Criteria for the Trout Co. Fish Raising Facility (Operational Criteria). Among other changes, this document called for a scaled down facility designed to comply with the water quality standards set by Water Resources. The Director then determined that compliance with the established conditions had been achieved and issued a final order granting the permit to Trout Co. This final order was issued without further hearing. Appellants, protestants below, contended it was a procedural error for Water Resources to fail to grant an additional hearing at which the appellants could object to and/or cross-examine the Operational Criteria; hence, they contended that the final order was made upon unlawful procedure. The district court agreed, and we agree with the district court.

The district court found, and we are not disposed to challenge, that the substantial changes found in the "Operational Criteria" offered by Trout Co. "in effect amended its application for a permit." R., Vol. 2, p. 68; *see* I.C. § 42–211 ("Whenever a permit has been issued pursuant to the provisions of this act, and the permit holder desires to change the ... nature of the intended use, or make other substantial changes in the ... proposed use or uses of the water, he shall file an application for amendment ..."). Section 42–211, which governs amended applications, provides for protests and hearings "in the same manner as provided by section 42–203, Idaho Code." Section 42–203, redesignated now as § 42–203A, in turn defers to § 42–1701A(1). That provision requires all hearings to be conducted in accordance with Chapter 52, Title 67 of Idaho Code, and with the rules of practice and procedure promulgated by the Director. I.C. § 67–5209, which addresses contested cases, indicates under subpart (c) that "opportunity shall be afforded all parties to respond and present evidence and argument on all is-

sues involved." Parties to contested cases also may conduct cross-examination "for a full and true disclosure of the facts." I.C. § 67–5210(3). Rule 5.1 of the Practice and Procedure Rules and Regulations of the Department of Water Resources specifically entitles a party to introduce evidence and cross-examine witnesses:

*Rights of Parties.* At any hearing, all parties named in the preceding rule shall be entitled to enter an appearance, to introduce evidence, examine and cross-examine witnesses, make arguments, and generally participate in the conduct of the proceeding. Other parties determined by the Director or the Board to be directly and/or substantially affected by the proceedings may enter an appearance, introduce evidence and, subject to the discretion of the Director or the Board, may otherwise participate in the conduct of the proceedings.

In sum, the protestants, as concerned parties, were entitled to a hearing at which they could object to the Operational Criteria, cross-examine witnesses, and present their own evidence.

By denying the protestants these rights, the Director erred procedurally. But, as discussed below, we can define no substantive error to date on the part of Water Resources. Thus, while reversal of the agency is inappropriate, the amended application is properly remanded for a new hearing to correct the procedural error. I.C. § 67–5215(g) ("The court may ... remand the case for further proceedings."); *see Caldwell v. Arizona State Board of Dental Examiners*, 137 Ariz. 396, 670 P.2d 1220, 1225 (Ariz.App.1983) ("Remand to an administrative agency or board is appropriate where the agency has been found to have violated a statutory procedural requirement."); 2 Am.Jur.2d *Administrative Law* § 765 ("The court must remand ... where the agency has taken action without meeting procedural requirements."). We affirm the district court's order remanding for additional proceedings, but in accordance with the remainder of this opinion.

The following two parts discuss the matters for reconsideration.

## II. FINANCING

Judge Smith held that the Director of Water Resources used an incorrect standard with regard to financing of projects in conjunction with a permit application. I.C. § 42–203A requires the Director to consider as one of several factors the financial resources of the applicant when deciding whether or not to issue a permit. In the instant case the Director, at the first hearing on the matter, determined the applicant had sufficient financial resources. Judge Schroeder disagreed and held the Director's decision was clearly erroneous: "A finding of financial ability to complete a $265,000 to $270,000 project on a $4,500 base is 'clearly erroneous' within the meaning of I.C. 67–515." Judge Schroeder concluded "there is a clear lack of evidence to support the finding of financial ability" and remanded the case to Water Resources for further hearing.

On remand, the Director determined the applicants did have sufficient financial resources. The Director stated:

The financial ability criterion of I.C. 42–203[A] should not be interpreted as requiring the applicant, at the time of the hearings on the protested application, to have enough cash available to immediately complete the project. The applicant must show that he can obtain the necessary financing to complete the project within five years. At the hearing, the applicant must prove that it is reasonably probable that he can obtain the necessary financing to complete the project within the time constraint of the permit and the Idaho Code.

The Director then stated in Conclusion of Law No. 4: "At a hearing on a protested application, the applicant must prove that it is reasonably probable that he can obtain the necessary financing to complete the project within the time constraints of the permit and the Idaho Code." The Director concluded that the applicant, Trout Co., made the necessary evidentiary showing

and had established its financial ability to complete the project. On the second appeal to the district court, Judge Smith disagreed with the Director's analysis.

Judge Smith objected to the "reasonably probable" standard used by the Director. He also concluded that the evidence in the case clearly did not support the Director's conclusions:

The evidence indicates that at the time of the hearing, the applicant did not have the financial resources to complete the project but would have to obtain financing from others who said they might invest in the project. The evidence did show an increased investment by the applicant from $4500 to $92,000. However, the project was said to require an investment of $127,350 additional to complete it. This Court believes that it was the intent of the legislature in enacting I.C. 42–203[A] that *an applicant was bound to show at the hearing that he then and there had the financial resources* to complete the project within the time allotted—not to exceed five (5) years as provided by I.C. 42–204. (Emphasis added.)

Judge Smith concluded that the Director's actions were "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record."

We believe Judge Smith was incorrect in his interpretation of the financial showing an applicant must make to comply with I.C. § 42–203A. Judge Smith's requirement that applicants show that they "then and there" have the financial resources is far too restrictive; such a standard may have an excessively chilling effect on water and land development in this state. The ultimate question under the financial resources requirement of I.C. § 42–203A is this: who should bear the risk of failure. Under the district court's "then and there" standard any risk of failure is eliminated at the permit application stage. Yet, opportunities for development of the water resources of the state also are eliminated for those who may not have the cash in the bank, but may be able to secure sufficient

336

resources during the five-year time limitation imposed by I.C. § 42-204 to put the water to beneficial use. The "then and there" standard, while admirably encouraging pecuniary caution, goes beyond a reasonable reading of the statutory requirement of "sufficient financial resources." I.C. § 42-203A(5)(d).

The "reasonably probable" standard used by Water Resources shifts the risk of failure and shows that the state is more willing to take a risk by providing individuals with the opportunity to put water to beneficial use. It indicates a willingness on the part of the state to take a chance that a proposed water use with sound prospects of financing will become a successful venture, thereby benefiting both the water user and the state. We believe this to be a more appropriate standard for the financial resources requirement of I.C. § 42-203A. The water resources of this state are not so limited that they must be safeguarded with permits issued *only* when the applicant has secured all necessary financing prior to the water appropriation permit application. At the same time, the applicant must make a showing that it is reasonably probable he or she will obtain the necessary financing within five years. The extent of the applicant's own investment is a strong factor to be considered.

■ The financial resources requirement, added in 1935, was clearly intended to prevent the tying up of our water resources by persons unable to complete a project because of financial limitations. The financial requirement provision was added at a time when unscrupulous promoters were obtaining permits and lulling unsuspecting investors into purchasing worthless securities on worthless projects. *See* Eighth Biennial Report of the Department of Reclamation, State of Idaho, 1933–1934, R.W. Faris, Commissioner of Reclamation, pp. 28–29. The legislature has pro-

vided Water Resources with the authority to weed out the financially insufficient applications. I.C. § 42-203A. We believe a showing by the applicant that it is "reasonably probable" that financing can be secured to complete the project within five years serves the purpose of screening out undeserving projects without being destructive of growth and development in the state. Any concern which may exist about tying up the water to the prejudice of a potential junior applicant is adequately satisfied by other statutory provisions requiring timely commencement, progress and completion of works. I.C. §§ 42-204 and 42-301. Thus we hold proper the "reasonably probable" standard originally applied by Water Resources.

■ Upon judicial review, Water Resources' factual determination under this standard must be upheld unless it is clearly erroneous. I.C. § 67-5215(g)(5). The record reveals considerable basis on which the Department could find it reasonably probable that the applicant would produce sufficient financing to sustain the project. As a result, there is no need to remand the financing question to the district court or to the agency. Accordingly, the district court's holding on the applicant's financial resources under I.C. § 42-403A is reversed, and the decisions of Water Resources in its Memorandum Decision and Order of October 21, 1981 and in its Final Order of July 21, 1982 on the issue of financing are affirmed and reinstated.

### III. THE LOCAL PUBLIC INTEREST

Since Water Resources's decisions on financing are reinstated, the only matters for the agency to consider on remand are those which relate generally to the local public interest. I.C. § 42-203A(5)(e). We turn first to the interpretation of this provision, a question of first impression before this Court.[2]

---

**2.** The requirement that Water Resources protect the public interest is related to the larger doctrine of the public trust, which Justice Huntley comprehensively discussed in *Kootenai Environmental Alliance v. Panhandle Yacht Club, Inc.,*

105 Idaho 622, 671 P.2d 1085 (1983). The state holds all waters in trust for the benefit of the public, and "does not have the power to abdicate its role as trustee in favor of private parties." *Id.* at 625, 671 P.2d at 1088. Any grant to

A. *Defining the Local Public Interest.*

Under I.C. § 42–203A(5)(e), if an applicant's appropriation of water "will conflict with the local public interest, where the local public interest is defined as the affairs of the people in the area directly affected by the proposed use," then the Director "may reject such application and refuse issuance of a permit therefor, or may partially approve and grant a permit for a smaller quantity of water than applied for, or may grant a permit upon conditions."

The Utah Supreme Court interpreted a similar provision to authorize the State Engineer "to reject or limit the priority of plaintiff's application [for a permit to appropriate water for a power project] in the interest of the public welfare." *Tanner v. Bacon*, 103 Utah 494, 136 P.2d 957, 964 (1943); *see also People v. Shirokow*, 26 Cal.3d 30, 162 Cal.Rptr. 30, 37, 605 P.2d 859, 866 (1980) (In the public interest, the Water Board may impose the condition that the applicant salvage the water required for his or her project.); *East Bay Municipal Utility District v. Department of Public Works*, 1 Cal.2d 476, 35 P.2d 1027, 1029 (1934) ("Where the facts justify the action, the water authority should be allowed to impose [on an application to appropriate water for a power project], in the public interest, the restrictions and conditions provided for in the act," or to reject the application "in its entirety."). Both the Utah and California Supreme Courts have upheld state water agencies which had granted appropriations subject to future appropriations for uses of greater importance—in effect prioritizing among uses according to the public interest. *Tanner, supra,* 136 P.2d at 962–64; *East Bay, supra,* 35 P.2d at 1027–30 (Both cases approved making appropriations for power subject to future

appropriations for agricultural or municipal purposes.). The Director of Water Resources has the same considerable flexibility and authority, which he has already implemented in earlier proceedings in this matter, to protect the public interest.

Indeed, I.C. § 42–203A places upon the Director the affirmative *duty* to assess and protect the public interest. In assessing the duty of the state water board imposed by California's "public interest" provision, the California Supreme Court declared, "If the board determines a particular use is not in furtherance of the greatest public benefit, on balance the public interest must prevail." *Shirokow, supra,* 162 Cal.Rptr. at 37, 605 P.2d at 866; *accord, Tanner, supra,* 136 P.2d at 962 (The State has "the *duty* to control the appropriation of the public waters in a manner that will be for the best interests of the public.") (emphasis added).

The authority and duty of the Director to protect the public interest spring naturally from the statute; the more difficult task for us is to define "the local public interest." Public interest provisions appear frequently in the statutes of the prior appropriation states of the West, but are explicated rarely. *See, e.g.,* Cal. Water Code § 1253; *see generally* 1 R. Clark, ed., *Waters and Water Rights,* § 29.3 (1967). I.C. § 42–203A provides little guidance. Fortunately, however, the legislature did provide guidance in a related statute, I.C. § 42–1501. We also derive assistance from our sister states and from the academic community.

In I.C. § 42–1501, the legislature declared it "in the public interest" that:

the streams of this state and their environments be protected against loss of water supply to preserve the minimum

---

use the state's waters is "subject to the trust and to action by the State necessary to fulfill its trust responsibilities." *Id.* at 631, 671 P.2d at 1094. Trust interests include property values, "navigation, fish and wildlife habitat, aquatic life, recreation, aesthetic beauty and water quality." *Id.* at 632, 671 P.2d at 1095. Reviewing courts must "take a 'close look' at the action [of the legislature or of agencies such as Water Re-

sources] to determine if it complies with the public trust doctrine and will not act merely as a rubber stamp for agency or legislative action." *Id.* at 629, 671 P.2d at 1092. Justice Huntley concluded, "The public trust at all times forms the outer boundaries of permissible government action with respect to public trust resources." *Id.* at 632, 671 P.2d at 1095.

stream flows required for the protection of fish and wildlife habitat, aquatic life, recreation, aesthetic beauty, transportation and navigation values, and water quality.

Not only is the term "public interest" common to both §§ 42–1501 and 42–203A, and the two sections common to the same title 42 (Irrigation and Drainage—Water Rights and Reclamation), but also the legislature approved the term "public interest" in both sections on the *same day*, March 29, 1978. 1978 Idaho Sess. Laws, ch. 306 § 1, pp. 768–69, and ch. 345, § 11, pp. 891–97. Clearly, the legislature in § 42–203A must have intended the public interest on the local scale to include the public interest elements listed in § 42–1501: "fish and wildlife habitat, aquatic life, recreation, aesthetic beauty, transportation and navigation values, and water quality." *Accord,* National Water Commission, *New Directions in U.S. Water Policy* 5 (1973) ("The people of the United States give far greater weight to environmental and aesthetic values than they did when the nation was young and less settled."), *cited in* R. Robie, *The Public Interest in Water Rights Administration,* 23 Rocky Mtn. Min.L.Inst. 917, 933 (1977).

In so intending, the legislature was in good company. Unlike other state public interest statutes, the Alaska statute enumerates the elements of the public interest. The public interest elements of I.C. § 42–1501 are almost precisely duplicated within the Alaska statute, which is set out in the margin.[3] Notably, the principal author of the Alaska statute was the eminent water law scholar, Dean Frank J. Trelease. R.

Robie, *supra,* at 940 n. 95. The views of Dean Trelease have been well received.

■ The Alaska statute contains other elements which common sense argues ought to be considered part of the local public interest. These include the proposed appropriation's benefit to the applicant, its economic effect, its effect "of loss of alternative uses of water that might be made within a reasonable time if not precluded or hindered by the proposed appropriation," its harm to others, its "effect upon access to navigable or public waters," and "the intent and ability of the applicant to complete the appropriation." Alaska Stat. § 46.5.080(b).

Several other public interest elements, though obvious, deserve specific mention. These are: assuring minimum stream flows, as specifically provided in I.C. § 42–1501, discouraging waste, and encouraging conservation. *See Shirokow, supra,* 162 Cal.Rptr. at 37, 605 P.2d at 866 (The California Supreme Court found water salvage to be sufficiently in the public interest to require it of a permittee.).

The above-mentioned elements of the public interest are not intended to be a comprehensive list. As observed long ago by the New Mexico Supreme Court, the "public interest" should be read broadly in order to "secure the greatest possible benefit from [the public waters] for the public." *Young & Norton v. Hinderlider,* 15 N.M. 666, 110 P. 1045, 1050 (N.M.1910) (Rejects considering only public health and safety; considers relative costs of two projects.). By using the general term "the local public interest," the legislature intended to in-

---

**3.** Alaska Stat. § 46.15.080 provides:

(b) In determining the public interest, the commissioner shall consider

(1) the benefit to the applicant resulting from the proposed appropriation;

(2) the effect of the economic activity resulting from the proposed appropriation;

(3) the effect on fish and game resources and on public recreational opportunities;

(4) the effect on public health;

(5) the effect of loss of alternate uses of water that might be made within a reasonable time if not precluded or hindered by the proposed appropriation;

(6) harm to other persons resulting from the proposed appropriation;

(7) the intent and ability of the applicant to complete the appropriation; and

(8) the effect upon access to navigable or public waters.

*See also Bank of Am. Nat. Trust & Sav. Assoc. v. State Water Resources Control Bd.,* 116 Cal.Rptr. 770, 771, 42 Cal.App.3d 198, 201 (1974) (If supported by the record, the state water board can condition a permit for a reservoir on providing for the public interest element of public access for recreation.).

clude any locally important factor impacted by proposed appropriations.

Of course, not every appropriation will impact every one of the above elements. Nor will the elements have equal weight in every situation. The relevant elements and their relative weights will vary with local needs, circumstances, and interests. For example, in an area heavily dependent on recreation and tourism or specifically devoted to preservation in its natural state, Water Resources may give great consideration to the aesthetic and environmental ramifications of granting a permit which calls for substantial modification of the landscape or the stream.

■ Those applying for permits and those challenging the application bear the burden of demonstrating which elements of the public interest are impacted and to what degree. As Judge Schroeder correctly noted below, this burden of production lies with the party

that has knowledge peculiar to himself. For example, the designer of a fish facility has particularized knowledge of the safeguards or their lack concerning the numbers of fish that may escape and the amount of fecal material that will be discharged into the river. As to such information the applicant should have the burden of going forward and ultimately the burden of proof on the impact on the local public interest. On the other hand, a protestant who claims a harm peculiar to himself should have the burden of going forward to establish that harm.[4]

■ However, the burden of proof in all cases as to where the public interest lies, as Judge Schroeder also correctly noted, rests with the applicant:

[I]t is not [the] protestant's burden of proof to establish that the project is not in the local public interest. The burden of proof is upon the applicant to show that the project is either in the local public interest or that there are factors

that overweigh the local public interest in favor of the project.

■ The determination of what elements of the public interest are impacted, and what the public interest requires, is committed to Water Resources' sound discretion. *See* 1 R. Clark, ed., *Waters and Water Rights* § 29.3, 170 (1967).

In light of the preceding discussion, the district court admirably established some of the public interest elements which Water Resources must consider in this case. Judge Schroeder observed:

First, as previously outlined, if the Department gives weight to the economic benefits of the project, it should also give consideration to the economic detriments. The effect of the project on water quality should be considered. It is not clear to what extent that was done in this case. The effect of the project on alternative uses of the watercourse should be considered—e.g., the impact on recreational and scenic uses. The effect on vegetation, wildlife, and other fish should be considered. This is not a catalogue of all factors that may relate to the public interest element, but is a suggestion of factors to be weighed in determining whether the project will or will not be in the public interest.

Judge Smith provided some specific guidelines, also needful of comment, to which our attention is now drawn.

B. *Specific Considerations Raised Below.*

1. **Finality of Design**

■ In order to be able to assess a project's impact on the public interest, the project's design must be definite enough to reflect its impacts and implications. Judge Smith held that because the applicant has the burden of proof to show a project is worthy of issuance of a permit, "the design of the proposed facility should be final,

**4.** Judge Smith observed correctly that Judge Schroeder's earlier orders constituted the law of the case. Hence, Judge Schroeder's opinion and order are considered as incorporated into the later opinion and orders of Judge Smith.

detailed and not schematic." He elaborated on the finality issue by stating:

> The department should not have to issue a permit on conditions that the Department review the final plans. The final plans should be presented to the Department with the application for a permit. Thus, all interested parties could review the plans, cross-examine in regard thereto and offer suggestions that might be helpful in reducing any adverse impact. The issuance of the permit, therefore, would also constitute approval of the plan.
>
> Any application for a permit that is not substantially complete in its engineering so that it cannot be properly evaluated for a here-and-now financial commitment or for impact on the public, can be readily denied by the Director. If he cannot grant the permit without establishing substantial conditions, he should deny the permit with leave to amend the application if he so desires affording all interested parties an opportunity to be heard if and when the application is amended. Such process would hopefully preclude some accusations that a Director is acting arbitrarily, capriciously or unreasonably.

■ In our perception, Judge Smith's language requires an applicant to present "blueprint quality" plans at the outset of seeking a permit, much in the same vein as his "here and now" standard of financing required ready cash. We are not persuaded that blueprint quality plans of a facility are *always* necessary when applying for a permit to appropriate water. Rather, the design plan for a proposed facility depends on the nature of the facility, the complexity of the proposal, and the extent of the proposed appropriation's impact on the local area. In this particular case, the Department will determine at the hearing on the amended application whether blue print quality plans and drawings are a prerequisite to giving approval. In all cases the plans should be sufficient to generally apprise the public of the efficacy of the proposed use in the planned facility, and of its potential impact.

## 2. Dewatering

■ The dewatering of Billingsley Creek raises significant public interest and public trust concerns. In his discussion of the issue Judge Smith simply declared that "the rights of an appropriator prevail over riparian rights." Such a statement on its face fails to account for the state's policy of providing for minimum stream flows, and for the public's legitimate interests in the stream environment, wildlife, aesthetics, recreation, and alternative uses. However, after reviewing the record, we agree with Judge Smith that Water Resources has dealt properly with the dewatering issue. Therefore we affirm Judge Smith's holding that there is no "legal basis for reversing the Department decision on the grounds that a portion of Billingsley Creek would be dewatered from 125 CFS to a 25 CFS minimum for an approximate 700 ft. stretch of the creek."

## 3. Health Hazard

Judge Smith opined that the law will not allow Billingsley Creek to become a nuisance or a health hazard, adding also that "a permit cannot issue which would allow construction of a project contrary to the authority of the Board of Health in policing water for pollution." Hence, Judge Smith concluded that the Director had authority to consider whether the design of any particular facility will meet all environmental requirements.

■ We believe this to be a correct assessment of the law, but add a word of caution regarding the differing functions of Water Resources and the Department of Health and Welfare. Water Resources must oversee the water resources of the state, insuring that those who have permits and licenses to appropriate water use the water in accordance with the conditions of the permits and licenses and the limits of the law. It is not the primary job of Water Resources to protect the health and welfare of Idaho's citizens and visitors—that role is vested in the Department of Health

and Welfare, including compliance with the water quality regulations and monitoring effluent discharge in our state's waterways. Nevertheless, although these agencies may have separate functions, Water Resources is precluded from issuing a permit for a water appropriation project which, when completed, would violate the water quality standards of the Department of Health and Welfare. It makes no sense whatsoever for Water Resources to blindly grant permit requests without regard to water quality regulations. Hence, Water Resources should condition the issuance of a permit on a showing by the applicant that a proposed facility will meet the mandatory water quality standards. Under this rule, Water Resources has the authority to withhold a permit application until it receives a proposed design which appears to be in compliance with the water quality standards. Once the conditional permit is granted, Water Resources has continuing jurisdiction over compliance with the conditions of the permit, including suspension or revocation of the permit for proven violations of the permit's conditions regarding water quality.

The Department of Health and Welfare continues to have the primary responsibility for policing water quality control in this state, and can exercise *in personam* jurisdiction over those who violate the state's water pollution laws. While it often may be both more feasible and more reasonable for Health and Welfare to take remedial steps against one violating the pollution laws, either by forcing compliance or shutting down a facility, than to resist an application for a permit in the first instance, Health and Welfare certainly has the right to be heard in proceedings before Water Resources. And, as appointed guardian of the quality of Idaho water, its views are entitled to consideration.

In sum, we agree with the district court, Judge Smith, that Water Resources cannot issue a permit which would allow construction of a project violative of the laws regulating water quality. However, later compliance with those laws after construction of a facility generally will be a proper concern of the Department of Health and Welfare.

## IV. CONCLUSION

The above elements of the public interest, together with other elements and factors which Water Resources deems relevant, will be considered at the hearing on the amended application. Water Resources should accept relevant testimony and other evidence providing additional information on the public interest.

The decision of the district court is reversed in part, affirmed in part, and remanded for further proceedings consonant herewith. No costs or attorney's fees allowed.

DONALDSON, C.J., and HUNTLEY, J., concur.

BAKES and SHEPARD, JJ., concur in the result.