## Pennsylvania State Athletic Commission v. Graziano

*Compton, Handler & Berman*, for appellant.

*Joseph C. Mansfield, Elmer T. Bolla*, Deputy Attorneys General, and *Herbert B. Cohen*, Attorney General, for appellee.

SOHN, J., April 17, 1957.—We have before us the appeals of Carmen Graziano, filed to no. 280, Commonwealth Docket, 1955, Court of Common Pleas of Dauphin County, and Anthony Ferrante, filed to no. 281, Commonwealth Docket, 1955, Court of Common Pleas of Dauphin County, as a result of the action of the Pennsylvania State Athletic Commission, which revoked the license of each appellant to act as a manager of boxers. The appeals have been filed pursuant to the provisions of the Administrative Agency Law. They were cited for alleged violation of the Pennsylvania Athletic Code of August 31, 1955, P. L. 531, 4 PS §30.101.

Two companion appeals, those of Pennsylvania State Athletic Commission v. Loughran, 9 D. & C. 2d 427, and Pennsylvania State Athletic Commission v.

Moran, 6 D. & C. 2d 611, had been previously argued, and the appeals dismissed. In both of them we held that the Act of June 14, 1923, P. L. 710, as amended, was constitutional. No appeals were taken from our decisions in those two cases. The present cases involve the Pennsylvania Athletic Code, which was approved August 31, 1955, and became effective the date of its approval. All of the matters of which the Pennsylvania State Athletic Commission complains were allegedly committed prior to the effective date of the Pennsylvania Athletic Code.

On March 13, 1956, the Supreme Court of Pennsylvania handed down its decision in Hallmark Productions, Inc. v. Carroll, 384 Pa. 348, 356, in which the Motion Picture Censorship Act of May 15, 1915, P. L. 534, as amended, 4 PS §41, was held to be unconstitutional. As a result, further argument was held in the two instant cases to determine whether the present Pennsylvania Athletic Code might be affected by that case.

The Motion Picture Censorship Act of May 15, 1915, as amended, 4 PS §43, provided that the Board of Censors "shall disapprove such (films) as are . . . indecent, or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals."

The Pennsylvania Supreme Court in the Hallmark case made a detailed analysis of the principal decisions of the courts of various states and the reversal of such decisions by the Supreme Court of the United States. The court stated:

"We have deemed it desirable thus to review the principal decisions of the State courts on the question here involved because they indicate that there exists a marked difference of viewpoint as to the exact import of the rulings of the Supreme Court of the United States in regard to the constitutionality of motion

picture censorship statutes. What is clear is that the term 'sacrilegious' in such a statute is so vague and indefinite in its connotation as to offend the due process clause of the Fourteenth Amendment (the Burstyn case, 343 U. S. 495) ; that authority given to a Board of Censors to refuse a permit if the picture be of such character as to be prejudicial to the best interests of the people is unconstitutional for the same reason (the Gelling case, 343 U. S. 960) ; that a provision that the picture must be of a 'moral, educational or amusing or harmless character' is likewise void for indefiniteness (the Superior Films case, 346 U. S. 587) ; that authority to reject a picture on the ground that it is 'immoral' and 'would tend to corrupt morals' is similarly void (the Commercial Pictures case, 346 U. S. 587) ; and that a statute authorizing the disapproval of films that are 'obscene or immoral' is void for the same reason (the Holmby Productions case, 350 U. S. 870) . . . .

". . . In view of the foregoing decisions of the Supreme Court, individually and collectively, we are of opinion that these terms must be held subject to the same fatal objections as those which invalidated the statutes held unconstitutional by that Court. . . ."

An examination of the decision in Burstyn, Inc., v. Wilson, 343 U. S. 495, discloses that the constitutional assault was predicated on three contentions: (1) abridgment of freedom of speech and of the press; (2) as a prohibition of the free exercise of religion; (3) that the term "sacrilegious" was so vague and indefinite as to offend due process. The Supreme Court stated, at page 499:

"As we view the case, we need consider only appellant's contention that the New York statute is an unconstitutional abridgment of free speech and a free press."

We believe, therefore, that the Burstyn case and all the later decisions decided on the authority of that case, including the decision of the Supreme Court of Pennsylvania in the Hallmark case, are authority only for the proposition that the motion picture censorship statutes or ordinances involved in those cases were unconstitutional as an abridgment of the guarantee of free speech and a free press. We do not believe that the Hallmark case furnishes any authority or support for the proposition that the Pennsylvania Athletic Code is unconstitutional. In the instant cases, there is no question of freedom of speech or of expression. There is a vast difference between the Pennsylvania Athletic Code and the motion picture censorship statute which has been held to be unconstitutional. The practice of the profession of boxing is not an unqualified right, but a privilege subject to license: Christensen v. Helfand, 143 N.Y.S. 2d 285 (1955).

Section 704 of the Pennsylvania Athletic Code provides that the commission shall have the power to suspend or revoke a license or permit in any case where the commission shall find that the licensee or permittee has done, or failed to do, any one or more of 20 specifically enumerated things. In Fitzgerald v. Philadelphia, 376 Pa. 379 (1954), the Supreme Court of Pennsylvania said, at page 386, citing American Communications Assn., C.I.O., v. Douds, 339 U.S. 382, 412:

" 'There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question. The applicable standard, however, is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed'."

In Howarth v. Gilman, 365 Pa. 50 (1950), the Supreme Court refused to hold that the term "practice of

engineering" was so vague, indefinite and uncertain that a court could not determine with a reasonable degree of certainty what the legislature intended and stated, page 55:

" '. . . An act will not be declared inoperative and ineffectual on the ground that it furnishes no adequate means to secure the purpose for which it is passed, if common sense and reason can devise and provide the means, and all the instrumentalities necessary for its execution are within the reach of those intrusted therewith'."

We have considered the case of Tanner v. Bacon, State Engineer, 103 Utah 494, 136 P. 2d 957, 964 (1943). There the Utah Court, in construing the wording of the law, "would prove detrimental to the public welfare, it shall be the duty of the State Engineer to reject such application", said:

". . . Evidently the legislature intended that upon the filing of an application to appropriate water the State Engineer should determine from the facts and circumstances of each case whether the approval thereof would interfere with the more beneficial use of the water, for one of the purposes mentioned, whether the purpose proposed in the application was for one of the purposes mentioned or for some other purpose . . .

"The State Engineer is also required by the statute to reject an application where in his opinion its approval 'would prove detrimental to the public welfare.' Under a statute using the exact words above quoted, the Supreme Court of Nebraska has approved the rejection of an application where there was a prior application to appropriate the same water. In re Commonwealth Power Co., supra, [94 Neb. 613] and in Kirk v. State Board of Irrigation, supra, [90 Neb. 627] under the same statute, that court held that the Board acted within the statute where it approved an application to appropriate water for power purposes, with the

limitation that the electricity generated shall not be transmitted beyond the boundary of that state. These decisions hold that anything which is not for the best interest of the public would be 'detrimental to the public welfare.' The Supreme Court of Oregon has given the terms 'menace to the safety and welfare of the public' a similar construction. Cookingham v. Lewis, 58 Or. 484, 114 P. 88, 91, 115 P. 342; In re Willow Creek, 74 Or. 592, 144 P. 505, 146 P. 475. Under this construction the State Engineer was authorized to reject or limit the priority of plaintiff's application in the interest of the public welfare:" page 509-10.

In Steisapir v. Sears Roebuck & Co., 112 N.E. 2d 548, 550 (Ohio App.) (1951), the court upheld the law which provides:

" 'When, in its opinion, the best interests of the community will be served thereby . . .'

". . . the Board may permit permanent use of land, in a residence district other than where the use is limited to one-family residences, for use of employee or customer parking of passenger automobiles, where such property abuts or is across the street from a district other than a residence district."

In the case of Pennsylvania State Athletic Commission v. Loughran, 9 D. & C. 2d 427 (1956), supra, we construed the phrase, "detrimental to the interests of boxing." There we said:

"We are well aware that our Supreme Court in Panther Valley Television Company v. Summit Hill Borough, 376 Pa. 375 (1954) has said:

' " ' "Where a statute is 'so vague, indefinite and uncertain that the courts are unable to determine, with any reasonable degree of certainty, what the legislature intended, or is so incomplete or conflicting and inconsistent in its provisions that it cannot be executed, it will be declared inoperative.' " ' " '

"In Murray v. Philadelphia, 364 Pa. 157, 176 (1950), and in Willcox v. Penn Mutual Life Insurance Co., 357 Pa. 581, 595 (1947), the same doctrine is followed.

"Appellant argues that the words 'sham or collusive boxing match' and acts 'detrimental to the interests of boxing' are too vague, indefinite and uncertain to be properly enforced, and vest too much discretionary power in the State Athletic Commission.

"We do not think that either of these two phrases is vague, indefinite or uncertain, or that the legislature is bound to define them, or to set up standards by which the commission must be governed in forming its judgment. We believe that any person of ordinary intelligence would have no difficulty in determining if a boxing match was a 'sham' and that one instinctively knows what acts 'detrimental to the interests of boxing' are, just as he consciously knows right from wrong. One need only read the entire act and its context to understand what the legislature had in mind when the questioned language was put in the statute . . .

"We believe that the opinion of Judge William E. Hirt in Commonwealth v. Klick, 164 Pa. Superior Ct. 449 (1949) is particularly demonstrative with respect to the issue we are passing upon here. This case involved the constitutionality of Section 1002(a) of The Vehicle Code of May 1, 1929, P. L. 905, as amended. At page 453, Judge Hirt points out:

" 'In 12 Am. Jur., Constitutional Law, §585, the universally accepted rule is thus stated: "It is a general principle of statutory law that a statute must be definite to be valid. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. On the other hand,

where the words assailed, taken in connection with the context, are commonly understood, their use does not render a statute invalid." The mandate of §1002(a) is a salutary police measure limiting the operation of motor vehicles, in the public interest. To define specifically permissible rates of speed under every conceivable condition would be manifestly impossible; hence the general language of §1002(a) is no valid objection to it on constitutional grounds. The ordinary person can understand what standard of conduct is imposed, as well as what he may do and what is forbidden under this provision of the Act.

" 'The same criticism which defendant urges here might be directed to §1001 (75 PS §481) of the Act making reckless driving unlawful. What is reckless driving or what is failure to drive at a careful and prudent speed depends upon the particular circumstances. As in the case of reckless driving, the determination of what constitutes driving "too fast for conditions" is for the finder of the facts, in this case a judge of the court below, in a summary proceeding.'

"Here we feel that the State Athletic Commission had a right to determine the facts and to decide whether the actions of Loughran were 'detrimental to the interests of boxing.'

"We believe that the phrases 'sham or collusive boxing match' and acts 'detrimental to the interests of boxing' need no definition by our legislature. Where is there an individual, interested in boxing, who has not, at some time or other, attended a boxing bout or a wrestling bout, in which the actions of the contestants became so apparently indifferent or collusive, in which it appeared so clearly that they were not putting forth their very best efforts to win the contest, that the audience indulged in catcalls, verbal comments, stamping of feet, whistling and in various other manifestations of disapproval of the way the contest was being

conducted? Any ten-year-old boy can quickly recognize such a spectacle. The public pays good money to see honestly conducted fights and expects each contestant to be in condition and to do his best. A veritable wave of protest has been sweeping over the whole United States against the way in which boxing generally has been conducted, and any person of ordinary intelligence knows that on many occasions the public has been hoodwinked and cheated out of their money. By this language we do not mean to judge this particular case, but we feel very strongly that the legislature knew exactly what it was saying when it put that language into the act and that no further definition is necessary . . ."

In the case of Pennsylvania State Athletic Commission v. Moran, 6 D. & C. 2d 611, 614 (1956), we said:

"In an opinion filed in this court on February 14, 1956, in the matter of the appeal of Thomas Loughran from the adjudication and order of the Pennsylvania State Athletic Commission suspending his manager's license, we held that section 15 of the Act of June 14, 1923, P. L. 710, as amended, was constitutional. Inasmuch as we have set forth in that opinion our reasons for so declaring, we will not repeat them here . . .

"Section 15, which we have in another opinion held to be constitutional, provides that the commission may revoke or suspend any license provided for in the act, after hearing, if the commision finds that the licensee has 'been guilty of an act detrimental to the interests of boxing.' Webster's Collegiate Dictionary, Fifth Edition, defines 'detrimental' as: 'Causing detriment; hurtful. Syn. — Pernicious, deleterious, harmful; "detriment" is defined as "injury or damage", or that which causes it; mischief; hurt.'

"The violation of section 13 of the act, as above set forth, is certainly not in the interests of boxing, and to the contrary, is detrimental to it.

"Appellant has further urged upon us that the act is unconstitutional as an unauthorized delegation of legislative power. The fact is that there has been no delegation of power whatsoever. The commission did not of its own motion revoke appellant's license without any reference to any legislative standard. What the commission did was to find, after hearing, that certain facts existed, which established that appellant was guilty of an act detrimental to the interests of boxing. There was sufficient evidence to support this particular finding . . ."

We would likewise like to point out that the Public School Code of March 10, 1949, P. L. 30, 24 PS §2-228, provides that in approval or disapproval of creation or change in school districts, that the State Council of Education:

". . . shall then determine whether such new school district, or independent school district, or union school district, or change in the boundaries of an existing school district of the third or fourth class, is desirable, *and whether the welfare of the pupils within the territory affected thereby will be promoted by the creation of such district or change in the boundaries of such existing district.*" (Italics supplied.)

We believe that the Pennsylvania Athletic Code is constitutional. Boxing has been a known and approved form of amusement in this country for over a century, and in the process of time has come to have certain well-defined characteristics. We believe, as was said in Mutual Film Corporation v. Industrial Commission of Ohio, 236 U. S. 230, 246 (1915), we can likewise say here, that the words of the statute under attack have gotten "precision from the sense and experience of men and become certain and useful guides in reasoning and conduct." We do not believe that under the provisions of the Pennsylvania Athletic Code, decisions are left to arbitrary judgment.

We will now pass to the question as to whether or not there was sufficient evidence to support the findings of the commission with respect to appellant, Graziano. The first finding of fact pertaining to Graziano is no. 6, which reads as follows:

"6. That Carmen Graziano associated with individuals with criminal records and of ill repute in that he was in frequent communication with Anthony Caponigro alias Tony Bananas, and relied on him for 'advice' with respect to the management of fighters."

A detailed examination of all of the testimony will show that Graziano has only been found to associate with this one individual, namely, Anthony Caponigro. So far as Caponigro is concerned, he did have a police record starting on November 1, 1926, and extending to October 13, 1934, at which time he was convicted of assault with intent to kill, larceny of an automobile and carrying weapons, on which he was sentenced from 7 to 10 years, having been paroled on December 15, 1941. During the ensuing 14 years, there is of record but one offense against him, namely, a charge of disorderly conduct, for which he was fined $10 on August 13, 1945. The finding of fact, it will be seen, states that Graziano associated with individuals with "criminal records." The Pennsylvania Legislature, in section 704, subsection 18 of the Athletic Code, did not lay that down as the test. The language of this section says, "associating or consorting with criminals". The question necessarily arises: If Caponigro has had a clean record for the past 14 years and has been associated in respectable business enterprises, is he still to be considered a criminal because at one time in his life he did come afoul of the law? If this finding of the commission is to be upheld, it simply results that once a man is a criminal, he is always a criminal, and that he cannot rehabilitate himself thereafter. In addition, there is no evidence anywhere in the record to show

that Graziano even knew that Caponigro at one time had a criminal record. There is a great discrepancy in their ages, Caponigro being a much older man. A careful reading of the testimony with regard to Graziano's alleged association with Caponigro will show that there is no basis for the commission's finding no. 6. Approximately five or six months after the· signing of the contract with respect to Giardello, the boxer, Graziano was introduced to Caponigro, through Anthony Ferrante, who was related to Caponigro. Graziano described Caponigro as a good fight manager and said that he only met him by attending the boxing matches. On one occasion he met Caponigro at his (Caponigro's) home, Ferrante also being present. Several times thereafter, he met Caponigro and they had numerous conferences on the telephone. He denied flatly that he knew Caponigro at one time had had a criminal record. With respect to this record, Graziano answered:

"A. No. As a matter of fact, I am amazed to hear it because in my presence he was always an honorable man."

He went on to describe the business of Caponigro. He said he knew that he had a swimming club and that he had the sale of recording machines. Ferrante and Graziano were co-managers of Giardello, and it was only natural for Graziano to seek advice from an older and more experienced man. He said with respect to Caponigro:

"A. Sometimes he would read in the papers that I was entertaining the idea of making a certain match, the I. B. C. (International Boxing Club) had offered me a certain match, and he would tell me if it was a good fight or bad fight or how much money the particular match might be worth, and so forth. He knew the value of our product."

This question was asked him:

"Q. I can understand you seeking advice from a man like Caponigro *who has been a manager and experienced with boxers*. But what I would like to know is why he would be calling you so many times in the period of a couple of months.

"A. That's the only conversations that we ever had.

"Q. He only called you to give you advice about your boxers?

"A. That's correct . . .

"Q. Mr. Graziano, does Caponigro have an interest in any of your fighters?

"A. No.

"Q. He has some interest because you just told me he called you more than 20 times in two months.

"A. *That's an interest which he took the liberty of taking*.

"Q. That interest he has? What interest does he have?

"A. He is probably interested in his cousin Anthony, and indirectly he finds himself interested in the fighters.

"Q. . . . Now I ask you specifically, does Caponigro have a financial interest in any of your fighters?

"A. None whatsoever.

"Q. *Do you share any of your managerial profits or income with Caponigro?*

"A. *No.*

"Q. *Or anybody else?*

"A. *No, sir.*"

To convict Graziano of associating with an individual with a criminal record and of ill repute, on testimony such as this, is to be spreading it very thin. In order to do so, one would certainly have to guess, and there is not sufficient evidence in the record upon which any definite conclusion could be based with respect to this particular matter.

The next finding of fact pertaining to Graziano is no. 7, which reads as follows:

"7. That Carmen Graziano knowingly filed with the Pennsylvania State Athletic Commission a false contract between himself and Anthony Ferrante as co-managers, and Wallace Bud Smith as a boxer."

The record does not support this finding of fact. Wallace Bud Smith was called as a witness and the following is quoted from his testimony:

"Q. What contract did you originally have with your new managers, so far as the distribution of the purse?

"A. Like I figured with two or three other managers I have had, sixty-six and two-thirds for the prizefighter, which I am, and thirty-three and a third to the managers, with all expenses coming off the top.

"Q. After the expenses were deducted, then you got two-thirds of what remained and they got one-third.

"A. Yes. . . .

"Q. You have heard it testified that notwithstanding the fact that there is a two-third, one-third contract on file, that *you asked for a 50 percent distribution.* Is that correct?

"A. That's correct. . . .

"Q. Now, you and your managers appeared before Commissioner Klein and stated under oath that the terms of the contract provided for a two-third, one-third split?

"A. *At the time,* I didn't state to my manager would it be okay for us to split the purse 50-50. . . .

"Q. Now, you came before me on the 30th of April, I think—excuse me, the 20th of April, and filed an application for a license, and you filed with me three copies of a contract signed by you, Mr. Ferrante and Mr. Graziano, is that correct?

"A. That's correct.

"Q. You sat in my office and I asked you whether you understood that contract. I asked you did you know what was in it?

"A. Yes.

"Q. You said you do understand, and I asked you are you satisfied with it and you said 'Yes, I am.' Is that correct?

"A. I believe so.

"Q. And then I said to all three of you, 'Do you swear that what is in this contract is true?' I got you to swear to it, you held up your right hands?

"A. That's right.

"Q. And you said 'Yes.' Now, notwithstanding, you had a separate agreement with Mr. Ferrante and Mr. Graziano that you were to get 50 per cent of your purse instead of ⅔; is that right?

"A. *I don't think at the time, no.*

"Q. You mean you entered into that later?

"A. I think it was later."

Later, by Commissioner Sullivan, the following appears:

"Q. Did you have in mind at the time that you were in the Commission office, on April 20 that later on you might change this agreement so that it would be the same as you had with Mr. Marsillo?

"A. Yes. That is what *I had in mind.*

"Q. Was that the only contract you had at that time, *or did you have an understanding with Mr. Graziano and Mr. Ferrante, that the contract would be changed?*

"A. *No.*

"Q. Is this contract that you filed in Philadelphia here the contract that was suggested to you by Mr. Graziano and Mr. Ferrante?

"A. *I was going to talk to them about it, we was going to discuss it. I was going to ask them, after the contract had been filed, maybe—*

"Q. I mean the 66⅔ and 33⅓ contract, was that provision, the 66⅔ and 33⅓, suggested to you as the contract by your new manager?

"A. Yes, it was.

142

"Q. *And you went along with that?*

"A. *Yes, I did.*

"Q. Did they tell you that that was the usual contract in Pennsylvania? Or what explanation did they give you?

"A. Well, they said that, plus the fact that that is a universal contract, as far as I know.

"Q. In Pennsylvania, or throughout the country?

"A. All the boxers I talk with, they have that type of contract."

A reading of the record will show that the usual contract in the boxing world was a two-thirds, one-third contract, which meant that after all expenses were paid, the fighter would receive two-thirds of the net amount and his manager, one-third. It also is evident that in many fights, the fighter would be better off taking one-half of the gross and the manager paying out of his one-half of the gross all the expenses. And it was testified, too, that the commission was well aware that this had been going on, and apparently with its approval, or at least without its objection. This is borne out by the following:

"Q. Did you ever acquaint the Commission with the fact that notwithstanding what the written contract purports to be, it seldom is the correct distribution?

"A. Well, the Commissioners here are new Commissioners, but I am sure Commissioner Weiner, while in office, was enlightened. He will go along and he will verify what I am telling you. I also think I told the present Commissioners of conditions like that that might exist."

Again, we have the following testimony:

"Q. Then you altered the provisions of that contract by oral agreement between yourselves?

"A. Yes.

"Q. And you never divulged that to either the former Commission or the present Commission?

"A. *Oh, yes, the former Commission knew about these things . . .*"

The third finding of fact pertaining to Graziano is no. 8, which reads as follows:

"8. That contrary to law, Carmen Graziano did from November 1953 to November 1954 participate as a co-promoter of the Plaza Athletic Club in Philadelphia without having first taken out a promoter's license and while also a co-manager of boxers."

The adjudication describes this so-called promoter's activity:

"Graziano also disclosed that he, Ferrante, Frank Green, another manager licensed by the previous Commission, and Jimmy Riggio, a licensed promoter, had joined in the promotion of fights at the Plaza Athletic Club, in Philadelphia, from November 1953 to November 1954 notwithstanding the provisions of the Athletic Code that a manager could not legally also be a promoter. Graziano testified that he believed the Chairman of the previous Commission had sanctioned this although he, Graziano, 'didn't think it was the proper thing to do.' The Chairman of the previous Commission testified that this had been done with his sanction because he felt 'the laws were bad' and that he believed he could supersede the code then in effect. The Chairman of the former Commission, called as a witness by Graziano and Ferrante said in his testimony: *'I take the responsibility that these men had an interest in this club down there.'* "

Although the adjudication states that under the provisions of the Athletic Code a manager could not legally be a promoter, there was nothing in that code shown to have been violated by the evidence. The acts having been done from November, 1953, to November, 1954, with the knowledge of the commission, when Graziano applied for and received his 1955 manager's license, the commission may not legally revoke his license on that

account. When the citation was originally issued on September 12, 1955, it contained no charge that Graziano, contrary to law, was a promoter. Later, at the time of the hearing, Graziano voluntarily told of his activity connected with the Plaza Athletic Club and his activity, as he described it, was an activity beneficial to boxers rather than detrimental to boxing in the Philadelphia area. It was at the request of former Commissioner Weiner that Graziano undertook to do what he did. The evidence is as follows:

"Q. Are these boys those you are developing and bringing up?

"A. That is right. With the rest of the fellows I had to invest my own money and do some of the promoting.

"Q. Where did you promote to get these boys the fights?

"A. Well, I promoted at the Plaza, and I promoted at Trenton Arena.

"Q. How many promotions did you have at the Plaza?

"A. Well, I promoted some 20 or 25 fights, I suppose, at the Plaza.

"Q. How many in Trenton?

"A. Approximately 12 shows at Trenton, New Jersey.

"Q. Was that the only way you could get fights for these boys?

"A. *That is the only way I could find it possible to get a preliminary fight and keep the fighter busy.*

"Q. Was there any outside influence that you could get for the purpose of getting any of these boys fights?

"A. None whatsoever.

"Q. In other words, *the fights that you got for these boys you got on merit and by reason of the fact that the actions that you took gave him those fights; is that correct?*

"A. *That's correct.*

"Q. By the way, when did you promote these fights?

"A. From about November, 1953, all the way up until approximately November, 1954, perhaps before that. About a year.

"Q. Did the Commission at that time know you were promoting these fights?

"A. *Commissioner Weiner knew that we had invested our moneys, because he felt that boxing was dead and it needed a stimulant and he knew that Anthony and I were aggressive and we were willing to contribute our money in order to stimulate boxing.*

"Q. Was it done with the Commissioner's approval at that time?

"A. I should think so . . .

"Q. You had gone to the Commission and requested what, Mr. Graziano?

"A. Requested helping in boxing shows throughout the City, investing my money and so forth, stimulating boxing, Commissioner.

"Q. You mean you had requested permission to promote fights, to act as a promoter?

"A. No, to invest any money I had in order that small clubs might again start to run, and in order that the fellows who were boxing preliminary fights wouldn't have to wait four and five months for a fight.

"Q. *When you asked permission to invest your money, didn't you know that you were thereupon becoming a promoter or co-promoter?*

"A. *I never interfered to that extent. I always requested from the promoter that my fights would get activity, but I never went about in making the matches* . . .

"Q. You mean that Commissioner Weiner asked you to become a co-promoter?

"A. It wasn't that specific.

"Q. What was it specifically?

"A. It wasn't as specific as you put it, that Commissioner Weiner asked me.

"Q. You said you responded to a request?

"A. Commissioner Weiner wanted to stimulate boxing, so he called several men whom he knew were interested in boxing, and who he knew wanted to invest some moneys in order to bring boxing back to Philadelphia . . .

"Q. All of this, you say, was done at the invitation of Commissioner Wiener?

"A. I wouldn't say at the "invitation"; *I would say at the suggestion* . . .

"Q. I believe you said, in answer to one of Mr. Klein's questions, that, as a co-promoter, you kept yourself away from having an interest in making matches; is that correct?

"A. That's correct.

"Q. I am referring to matches at the Plaza.

"A. That is correct.

"Q. *In your one capacity as a co-promoter you divorced yourself from the matchmaking end of it?*

"A. *That's correct* . . .

"Q. . . . When you arranged a match for your own fighter at the Plaza, there *your interest was only as a manager?*

"A. *As a manager in my fighter; that is correct* . . .

"Q. *At the same time it did a lot of good for the fighters you manage, because it got them fights?*

"A. *It did a lot of good for all fighters in general, the boxing game in general* . . .

"Q. Mr. Graziano, in the promotions at the Plaza did you derive any profit from your investment or promotion?

"A. *I lost $1,800 the same as Mr. Frankie Green lost.*

"Q. What fractional interest did you have in the promotion?

"A. Twenty-five percent, the four of us, 25 percent apiece.

"Q. Win, lose, or draw, so to speak?

"A. Lose."

Frank Weiner, former State Athletic Commissioner, in Philadelphia, was then called as a witness. He requested that he be permitted to tell his story in his own way. He said: When I came back onto the commission in July, 1953, boxing was at one of the lowest ebbs in Pennsylvania that I had ever seen it. There were no clubs running except the little Cambria Club. Once in a while they had a television show here that was promoted by the I. B. C., for which they had no license, and I thought it would be a good thing to try to stimulate boxing in Philadelphia, so I went to see Jim Toppi. I said to Toppi: "How about you going back in the boxing business and opening up your club again?" He said: "I'll think it over. I might do that." He came to me a little later and brought Jimmy Riggio, whom I had never known, and just to give it a little touch of spice, there was a Democratic legislator from one of the south wards with him to use his influence to get him a license. I told him it didn't make any difference whether he was a Democrat or Republican, if the man was creditable I would give him a license. Nothing was said about anybody else copromoting with him at that time.

A little while afterwards, up to this time Riggio had the license; he had the lease; he had the bond. There was nobody else with him, but he came back and asked for my permission to allow these managers, in order to get their fighters to have a piece of this fight. I didn't know they had a 25 percent interest in the club or in its profits, but to be interested to put their boys in the fights down there and to have a little financial interest in it. Quoting Mr. Wiener again:

". . . So they must have recognized that the laws were bad, and that was one of the laws that was bad;

in order to get these young fellows, instead of hanging around corners and running out nights, giving them a chance to fight, I said to these boys: 'Go ahead, put your boys into that club. It is all right with me.'

"I told this to Riggio. Riggio knew I knew these boys were managing the fighters and the boys were fighting in the clubs, but the fights down there, we never had any complaints about them. The fights were good.

"The same thing, we opened a club out on Market Street, 39th and Market, for the same purpose, to try to give the young men in this locality an opportunity to make a living and to box, and I do take the responsibility for telling these boys to go ahead: 'If that is the only way you can make any money with these boys, let them fight, and I will be responsible for it,' and I take the responsibility that these men had an interest in this club down there."

Although Mr. Weiner testified that he did not know that these men each had a 25 per cent interest in the club, *he did say that even if he did know it, he would still have let them fight.* His exact language is the following:

"A. I said, if I did know it, I would let them fight. I didn't say I knew at this time. I said, if I did know it, I would have let them go on just the same."

He was asked this question:

"Q. Why was it necessary to have a special meeting with these four gentlemen to arrange a percentage?

"A. Because Mr. Riggio couldn't have gotten the fighters from these fellows. He didn't have the money and capital to go ahead and do it without their help. If they took it and didn't make it, the chances are they took less than what they had in their contracts. They never got more."

He testified further:

". . . 'Here, boys, rather than do nothing, we will go in here and fight for Riggio.' Riggio was the man

who signed the contracts with them. I don't see where there is anything so terrible about that. In fact, there is much more in the laws that was done then and is done now, worse than that."

Commissioner Sullivan summed up this evidence as follows:

"Q. Mr. Weiner, I wonder if what you had in mind was that these men were merely underwriting the continuance of that club or that organization?

"A. That is more on the line of it.

"Q. That was the impression I get from your testimony.

"A. That's right. This club never would have opened and never could have opened, because Mr. Riggio didn't have the money to go out and operate that club and get the local boys boxing here. They are all local boys; very few came out of town . . .

"Q. Your feeling was that you were getting men in to stimulate the re-opening of the small club—

"A. Sure, I put the money up myself several times. I wasn't a promoter . . ."

The law in force at the time this occurred is found in section 13 of the Athletic Code. It provides as follows:

"Section 13. Financial Interest in Boxer Prohibited.—No corporation or person shall have, either directly or indirectly, any financial interest in any boxer or wrestler *competing on premises owned or leased by the corporation or person or in which such corporation or person is otherwise interested.*" (Italics supplied.)

This language of section 13 prohibits a person having any financial interest in any boxer competing on premises owned by the person or in which such person is otherwise interested. But from the evidence it is clear that prior to the commissioner's suggestion that these men throw in some money in order to stimulate

boxing, that Graziano neither owned nor leased nor in any other way was interested in the premises where the boxing occurred. The lease prior to and during the time was held by Mr. Riggio. This was no sham or subterfuge or violation of any law. The testimony also clearly shows that Graziano in no way acted as a matchmaker or a promoter. He confined his activity entirely to that of managing boxers.

We feel that to permit the revocation of Graziano's license on the ground that he did what the commissioner of boxing suggested that he do, should not be as a basis for the revocation of his license. Under the evidence, it is clear that these acts were known to the commission at the time Graziano was issued his 1955 manager's license.

In the Matter of Revocation of Restaurant Liquor License, etc., 8 Fayette 40, 42 (1945), a like situation appears. We quote from that opinion:

"It can scarcely be believed that an administrative body, with far reaching quasi-judicial power and authority would revoke a license granted by it for reasons existing, and the knowledge thereof in its possession at the time of granting such license . . .

"We, therefore, have no hesitancy in holding that the Liquor Control Board abused its discretion in undertaking to revoke a license issued by it for causes existing at the time of such grant, and such causes known to the licensing authority."

What Graziano did along this line was suggested to him that he do by one of the commissioners, and we fail to find that the testimony shows that he was guilty of any law violations.

This being an appeal under the Administrative Agency Law, it is required that any finding of fact made by the Pennsylvania State Athletic Commission and necessary to support its adjudication, must be supported by substantial evidence. In Pennsylvania

State Board of Medical Education and Licensure v. Schireson, 360 Pa. 129, 133 (1948), the law on this subject is set forth very clearly. We will quote therefrom:

"In *P. L. R. B. v. Kaufmann Dept. Stores, Inc.*, 345 Pa. 398, 400-401, 29 A. 2d 90, Mr. Justice HORACE STERN, speaking for this Court, defined 'substantial and legally credible evidence', as follows: 'All orders and decrees of legal tribunals, including those of administrative boards and commissions, must be supported by evidence sufficient to convince a reasonable mind to a fair degree of certainty; otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion": . . . ' "

Here we must find that not only is there a complete want of substantial evidence to support the findings of fact, *but that there is no evidence in the entire record to support the findings of fact.* We cannot find that the relationship between Graziano and Caponigro violated any law. Caponigro had a criminal record, 14 years previous to the happening of the matters testified to here, but there is no evidence to show that Caponigro, during the time that Graziano knew him, was a criminal. Neither is there any showing that there was anything improper in Graziano relying on an experienced manager for advice.

With respect to the filing of a false contract, the testimony clearly shows that at the time it was filed, it was the exact contract then and there existing between Graziano and Wallace Bud Smith, and that these verbal alterations which they voluntarily testified to came up sometime much later.

Nor does the record show that Graziano was a pro-

moter of fights, but to the contrary, it shows that what he did was for the good of boxing in Pennsylvania and not to its detriment. It was at the suggestion of Pennsylvania State Athletic Commissioner Weiner that money was invested in order that young boxers need not walk the streets but could pursue their chosen profession. A review of all this evidence shows that Graziano at all times acted properly and with the best interests of the boxing profession at heart. At the time of the hearing, he was 34 years of age, and had been reared in the City of Philadelphia. He was a graduate of South Philadelphia High School and of Villanova College in 1941. He served two and one-half years in the United States Navy and received an honorable discharge therefrom. His history is that as a young man he participated in various forms of athletics, and when he himself no longer participated, he became interested in the welfare of youth, sponsored basketball teams, football teams and all types of athletics for the children of the community.

As bearing on the question of whether he acted at all times in the best interests of boxing, we cannot overlook the testimony about what he did when he was a co-manager of Vinnie DeCarlo. This young man had a fine future as a boxer, but several times he went to California, where, in other hands, he became outmatched and became a physical and nervous wreck. Graziano helped to bring him to Philadelphia, and on several occasions, although he had opportunities to sell DeCarlo's contract and would have realized a profit of $2,500, he knew that to do so would be to injure this young man, who was only 20 years of age. Instead of making a personal gain and turning what had been a financial loss into a monetary profit, he went to the Pennsylvania State Athletic Commission and saw to it that DeCarlo's license was taken away from him for his own safety. In addition, Graziano has held a man-

ager's license for approximately five years and during that time there has not been one blemish against him. Former State Athletic Commissioner Weiner testified on his behalf as to his reputation, and various other witnesses bore testament to his good reputation.

We are forced to the inevitable conclusion that this record revoking Graziano's license constitutes an absolute abuse of discretion, and that the action of the Pennsylvania State Athletic Commission was both unreasonable and capricious, and we are in duty bound to set it aside.

The licenses in these two cases which have been revoked would have expired in due course on December 31, 1955. Ordinarily, they are renewable licenses, so that a question affecting a previous license is not a moot question. However, the action of the commission in revoking the licenses, being penal in nature, places a blot upon appellants' records, and we feel that they are entitled to have that blot removed. So long as the revocation of these appellants' licenses remains on the record, they could be subjected, unfairly and illegally, we feel, to the revocation and suspension of their licenses in other States. The courts have recognized that the question of revocation does not become moot upon expiration of the period for which the license was issued. See Rattray v. Scudder, 28 Cal. 2d 214, 169 P. 2d 371 (1946). To a like effect, we have the following cases: Technical Radio Laboratory v. Federal Radio Commission, 36 F. 2d 111 (1929) (Ct. of Appeals of D. C.) ; Artists and Writers Ass'n. v. State Department of Liquor Control, 96 Ohio App. 121, 121 N. E. 2d 263 (1953) ; Burke v. Coleman, 356 Mo. 594, 202 S. W. 2d 809 (1947).

There is another matter which pertains equally to the appellants, Graziano and Ferrante. The act under which the hearings were held and the order of revocation made is the Act of August 31, 1955, P. L. 531,

section 905 of which provides it shall become effective immediately upon final enactment. The citations were served on appellants September 12, 1955, and hearings were held, starting September 22, 1955. All of the things of which the commission complains were acts allegedly committed prior to the effective date of this particular law.

It has always been the law of Pennsylvania, which is specifically recognized by section 56 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §556, that:

"No law shall be construed to be retroactive unless clearly and manifestly so intended by the Legislature."

We have already pointed out that the applicable sections of the present act are penal in nature and must be strictly construed. We fail to find anything in the act which shows an intent upon the part of the legislature to have the act apply retroactively. On the contrary, two of the sections show the intent that the act is to be prospective only. Those sections are as follows:

"Section 104. Status of Existing Licenses and Permits Preserved.—All licenses and permits issued, pursuant to any act repealed by this act, shall continue with the same force and effect as if such act had not been repealed, subject, however, to the power of the Commission, as provided in this act, to suspend or revoke the license or permit of any such person for any of the causes or reasons set forth in this act and subject to the power of the Commission to require any such person to obtain a license or permit pursuant to this act.

"Section 105. Saving Clause.—The provisions of this act, so far as they are the same as those of existing law, are intended to be a continuation of such existing law and not as new enactments. The provisions of this act shall not affect any act done, liability incurred,

right accrued or vested or suit or prosecution pending as of the effective date of this act, or any action to enforce any right or penalty or punish any offense under authority of such repealed laws. All rules and regulations made pursuant to any act repealed by this act shall continue in full force and effect."

It thus would seem that existing licenses continue with the same force and effect, and section 105 states that the provisions of the act "shall not affect any act done". Accordingly, it is clear that the act was not intended to have a retroactive application.

The act in effect at the time the acts were alleged to have been committed in these two cases appears in the pocket part of Title 4, Purdon's Statutes, §1 et seq. That act provides, inter alia, that the license of a manager may be revoked or suspended by the commission after a hearing, if it is found that the licensee has "in the judgment of the said commission, been guilty of an act detrimental to the interests of boxing": 4 PS §12. We have heretofore pointed out in this opinion that appellant, Graziano, has not been guilty of any act detrimental to the interests of boxing.

The acts allegedly committed by appellants herein were not acts upon which the commission could have revoked appellants' licenses.

In Shenandoah Borough Council Appeal, 368 Pa. 624 (1951), our Supreme Court considered the Act of 1947 empowering a municipality to remove a policeman or fireman for violation of any law of the Commonwealth. The court held that the act could be given no retroactive effect and that a crime committed prior to the enactment of the Act of 1947 could not be used as the basis for the discharge of the Chief of Police.

We will now turn our attention to the factual matters concerning Anthony Ferrante, the other appellant. The first finding of fact pertaining to him is as follows:

"1. That Anthony Ferrante was and is an associate of known criminals, gamblers and persons of ill repute."

In the adjudication on page 5, the following appears:

"The Commission established that Ferrante knew and associated with other individuals with substantial police records, to wit, Ignatius Esposito, Dominic Sparagno, both of whose police records were offered in evidence as well as Michael Pisano, also known as 'Mickey Spinach'."

On page 6 of the adjudication, we have the following:

"Testimony by Philadelphia policemen and detectives showed that Ferrante and Ignatius Esposito and Nicholas Amato, another individual with a police record, had been observed in frequent association, in restaurants and on the streets of Philadelphia, and that Esposito had told a policeman that he was going into business with Ferrante. This was as late as February 1955."

The finding of fact above set forth does not state with whom Anthony Ferrante associated. We must therefore assume that the above quoted paragraph from the adjudication supplies that missing finding of fact. However, the evidence does not substantiate that finding. Ferrante was born and raised in South Philadelphia, and of necessity must have known a lot of the men whose names have been mentioned in these proceedings. He admitted that he knew Ignatius Esposito and had seen him quite often. On one occasion he had dinner with him, and on other occasions they telephoned one another. However, he denied that he ever knew that Esposito had a criminal record. He was asked how long he had been friendly with Esposito and answered: "I don't know what you call friendly, but about 5 or 6 years, off and on." He denied that he knew that he had served time at Lewisburg, and said: "I don't follow him, I didn't follow him that closely. We never discussed his personal business."

Detective Davidson testified that he found Ferrante in the company of Ignatius Esposito on three different occasions in Philadelphia, namely, one time on South Broad Street, another time at the Rainbow Grill at 13th and Dickinson Streets, and the third time on 9th Street, when Nicholas Amato from Newark, N. J., was in Philadelphia. He admitted that he could not hear any of the conversation and said that the last time he saw him with Pisano was on September 11, 1955.

Another officer, Officer Mancini, testified that during a conversation which he had with Ignatius Esposito, the latter said he was going into business with Anthony Ferrante. We cannot help but observe that this was purely hearsay testimony, and the record, moreover, shows that the business which Esposito told the officer he was going to conduct with Ferrante was never opened, so it is clear that only on three occasions these officers saw Esposito and Ferrante together. What they were doing together or how long they were together the record does not disclose. Certainly these three instances do not warrant the conclusion that they "had been observed in frequent association."

Ferrante was also questioned about a man by the name of Dominic Sparagno. Sparagno's picture was shown to Ferrante and he was asked when they had last spoken to each other. The answer was: "It must have been about three months." Ferrante then detailed how Sparagno had bought a tavern and that by chance he had happened to go into that tavern to get a sandwich, and that that was the last time he had seen him. He admitted that he knew Sparagno for about 12 or 13 years, but had never been out in his company. He denied that he knew Sparagno had a criminal record, but merely said that after having been shown his picture, he took it for granted from that fact that Sparagno had a criminal record. He denied knowing it himself and the only thing he would admit was that he

knew Sparagno had been locked up for something. He
also said that he knew Sparagno had a legitimate
business, a grocery store.

Giardello was asked whether he had ever seen
Sparagno in the company of Ferrante or Graziano and
said the only place was at the fights. He denied that
he knew Sparagno had a criminal record.

Ferrante also admitted he knew Mike Pisano and
said that he was a florist. He denied knowing that
Pisano had ever been arrested. He admitted that on
June 22, 1955, they had gone to Atlantic City together,
but again denied he knew that Pisano had any crim-
inal record. Detective Davidson testified that on one
occasion, namely, on September 1, 1955, he observed
Ferrante in the company of Michael Pisano at a time
when they were walking in the 1900 block on South
Broad Street, Philadelphia. He said he did not know
what their conversation was about, that at the time
Ferrante was not under surveillance, but that another
individual was.

With regard to one Nick Amato, Ferrante admitted
that he knew him also. He said he knew he had a tavern
and a swim club and that he was in the steel business.
He said the last time he saw or spoke to him was on
8th Street in Philadelphia and they had dinner to-
gether at an Italian restaurant at 10th and Catherine
Streets. He denied having called him on the telephone
within the last couple of months, and said that the
previous year he had had occasion to call him as a
matter of condolence when a child of the Amatos had
died. He admitted that they had been friends for a
long time and they had met through Ferrante's cousin,
Caponigro. On one occasion he said he had had dinner
with Amato, also that he had met Amato several other
times, at least one of which was in Caponigro's home.
He was asked whether Nick Amato had a criminal
record and answered: "That is one thing I can honestly

say I don't know. I didn't even know he had a criminal record."

With respect to Caponigro, the testimony discloses that Ferrante and Caponigro were cousins, and that they spoke to each other quite frequently by telephone for family reasons and on account of Caponigro's experience as a licensed manager of boxing in the State of New Jersey. He admitted that he had heard his cousin at one time had had some criminal charges against him, but that he did not know what they were of his own knowledge. In the entire record there is not one iota of evidence indicating other than a family relationship between these two cousins. It was only natural that Caponigro, being older than Ferrante and having had experience as a boxing manager, would give advice to Ferrante in the handling of Ferrante's boxers.

The second finding of fact pertaining to Ferrante is finding of fact no. 2, which reads as follows:

"2. That Anthony Ferrante introduced Joey Giardello, a boxer under his co-management to Anthony Caponigro, an individual with a long criminal record, and established a relationship between them that enabled Giardello to borrow money from Caponigro to pay his gambling debts."

In the adjudication the following appears on page 5:

"The record further shows that Ferrante took Giardello to Caponigro's home where they had dinner and a sufficiently friendly relationship was established for Giardello to borrow money from Caponigro for the payment of Giardello's gambling debts."

Giardello was called as a witness by the Commission. The record shows that only on one occasion did Giardello borrow any money from Caponigro and that was the mere sum of $200, which he repaid. Giardello, on one occasion in 1953, had bet on the Brooklyn Dodgers to win the World Series and Brooklyn had lost. He said:

"A. Well, I made a bet and I had to pay it off. I couldn't get ahold of Ferrante and Graziano and he is the only one I thought of. If I couldn't get ahold of Anthony, to call him.

"Q. Did Ferrante tell you if you couldn't get ahold of him, Ferrante, you could call Bananas for help?

"A. No. To see if he was over there.

"Q. To see if he was over there?

"A. Yes.

"Q. When you found he wasn't there, you asked him for a loan?

"A. Yes."

This was the only testimony regarding this matter in which the implication was attempted to be given that Giardello, through loans of money, had been placed under the control of Caponigro through his introduction to Caponigro by Ferrante.

The third finding of fact with regard to Ferrante is the following:

"3. That Anthony Ferrante sought to bribe a police officer to permit him to participate in the setting-up and operation of an illicit bootleg still."

The adjudication with respect to this finding of fact is as follows:

"Testimony further showed that during the summer of 1954 Ferrante and another individual approached Officer DiNova and Chief of Police Joseph Burger of Williamstown, N. J. and sought protection for the setting-up of an illicit still. Chief Burger confirmed his identification of Ferrante at the hearing and stated that he had reported the incident to appropriate enforcement agencies. Officer DiNova testified that after a still had been raided in his area, Ferrante came to the police station on a pretext and wanted to know who had "fingered" the still.

"The Commission considers it significant that there

was no cross-examination on this subject by counsel for Ferrante with the exception of a single question."

We have read the entire record with respect to this so-called bribe of a police officer and fail to find anything which would substantiate it. When Chief Burger was asked whether Ferrante tried to bribe him, he said *he thought that was what he was going to do next.* This was purely a conclusion and not based on any evidence whatsoever. Nor is there anything in the record which shows that Ferrante participated in the operation of the alleged bootleg still. To the contrary, the record shows that one Anthony Fraese and Frank DeGregnio were arrested in connection with the operation of this still and no connection whatsoever was ever shown between Ferrante and these two men.

On page 6 of the adjudication, it is said that Ferrante went to the police station *on a pretext* and wanted to know who had "fingered" the still. The record does not show that Ferrante went to any police station and certainly not "on a pretext." The only person who used the word "fingered" in the entire hearing was a representative of the athletic commission. Officer DiNova testified that Ferrante was his cousin and that he received a telephone call from him, in which he inquired how the police found out about the still. Officer DiNova was asked whether on any other occasion Ferrante had come to see him to discuss a still and he replied that he had not. The most that can be said of Chief Burger's testimony is that Ferrante, on behalf of somebody, asked whether a still could be set up, but that he did not at any time try to bribe the Chief. Nor does the testimony show that the Chief thereafter saw Ferrante. The only reason why counsel for Ferrante did not question this witness extensively was because there was no occasion to do so.

The fourth and fifth findings of fact with respect to Ferrante are as follows:

"4. That Anthony Ferrante knowingly filed with the Pennsylvania State Athletic Commission a false contract between himself and Carmen Graziano as co-managers, and Wallace Bud Smith as a boxer.

"5. That contrary to law, Anthony Ferrante did from November 1953 to November 1954 participate as a co-promoter of the Plaza Athletic Club in Philadelphia without having first taken out a promoter's license and while a co-manager of boxers."

These two findings of fact are identical with findings of fact nos. 7 and 8 pertaining to Graziano, and the same evidence which has already been reviewed by us with regard to Graziano applies to Ferrante in these two particular instances. We therefore deem it unnecessary to dwell further upon this matter.

In summing up the testimony with respect to Ferrante, the evidence shows that Ferrante at the time of the hearing was a young man 34 years of age, who had been reared in a neighborhood where many of the persons mentioned in this record had been born and lived. Although Ferrante stated that he knew a lot of these people, the evidence does not show that he associated with them with any type of frequency and continuity, which alone could make the case against him reasonable. To say that you know someone is not to say that you associate with him. With respect to the still episode, there is nothing in the record except such facts as might amount to a suspicion. Here there was no testimony related to any overt act or any statement upon which it could be found that Ferrante sought to bribe a police officer. Nor is there sufficient evidence with regard to the finding of fact which tried to impute some nefarious conduct on the part of Ferrante in introducing Giardello to Caponigro. On only one occasion did Giardello testify that he called Caponigro to locate Ferrante and not finding Ferrante, requested a loan

of $200 from Caponigro, which he repaid. This was in respect to the bet he lost on the Brooklyn Dodgers.

Having reviewed this whole record with respect to Ferrante, we have come to the conclusion that in revoking manager's license no. 246, issued to Anthony Ferrante, the Pennsylvania State Athletic Commission acted contrary to the evidence, that its action was arbitrary and capricious, and amounted to an abuse of discretion.

In view of all that we have said heretofore, we make the following order with respect to both appellants, Graziano and Ferrante; these orders are to be considered as filed separately:

### *Order*

And now, April 17, 1957, in the case of Pennsylvania State Athletic Commission v. Carmen Graziano, appellant, filed in the Court of Common Pleas of Dauphin County, Pennsylvania, to no. 280, Commonwealth Docket, 1955, we find that in many instances the commission has given retroactive effect to the Act of 1955, which is prohibited. With respect to all factual matters, we find that the evidence does not sustain the findings of fact, and therefore the appeal is sustained and the commission is directed to reinstate his boxers manager's license which it had previously revoked.

In the case of Pennsylvania State Athletic Commission v. Ferrante, appellant, filed in the Court of Common Pleas of Dauphin County, Pennsylvania, to no. 281, Commonwealth Docket, 1955, we find that in many instances the commission has given retroactive effect to the Act of 1955, which is prohibited. With respect to all factual matters, we find that the evidence does not sustain the findings of fact, and therefore the appeal is sustained and the commission is directed to reinstate his boxers manager's license which it had previously revoked.